# IN THE SUPREME COURT OF IOWA

No. 11–0719

Filed February 22, 2013

**STATE OF IOWA,**

   Appellee,

vs.

**JEFFREY ALAN SCHORIES,**

   Appellant.

_____

   Appeal from the Iowa District Court for Polk County, Odell G. McGhee, Judge.

   A criminal defendant challenges his conviction for driving while intoxicated. **REVERSED.**

   Mark C. Smith, State Appellate Defender and Martha J. Lucey, Assistant Appellate Defender, and Samuel S. Berbano, Student Legal Intern, for appellant.

   Thomas J. Miller, Attorney General, Sharon K. Hall, Assistant Attorney General, John P. Sarcone, County Attorney, and Brendan E. Greiner, Assistant County Attorney, for appellee.

**APPEL, Justice.**

Jeffrey Schories was arrested and charged with operating a vehicle while under the influence of a controlled substance in violation of Iowa Code section 321J.2(1)(*c*) (2009). Schories asserted, among other things, the affirmative defense provided under Iowa Code section 321J.2(7)(*b*), which provides that an operator of a vehicle cannot be convicted of operating under the influence of a drug if he is taking the drug as prescribed by his doctor and in accordance with the labeling directions of the pharmacy. Notwithstanding this defense, a jury convicted Schories of operating while intoxicated.

On appeal, Schories claims there was insufficient evidence to support the verdict, that the court failed to properly instruct the jury on the prescription drug defense, and that the district court improperly allowed evidence into the record related to a syringe found in the automobile he was driving at the time of his arrest. Further, Schories asserts his lawyer provided ineffective assistance by failing to properly preserve his insufficiency-of-the-evidence claim, failing to ask for a spoliation instruction in light of the state's failure to preserve the syringe, failing to ask for a more specific instruction related to his affirmative defense, and failing to present evidence that Schories sold his plasma, which would have rebutted any inference that may have arisen from the presence of track marks and bruising over the veins of his arms. However, because we find there was insufficient evidence to support the verdict and reverse the district court, we need not consider Schories's other claims.

## I. Factual and Procedural Background.

On August 27, 2010, Des Moines police officer Colin Boone observed Schories driving a vehicle in what Officer Boone considered an

erratic manner. After a preliminary investigation at the scene, which included the discovery of a syringe in between the front seat and the center console of the vehicle driven by Schories, Officer Boone transported Schories to the police station for further evaluation. After additional tests revealed methadone in Schories's urine, the State charged him with operating while intoxicated under Iowa Code section 321J.2(1)(*c*), which provides that a driver commits the offense when driving "[w]hile any amount of a controlled substance is present in the person, as measured in the person's blood or urine." Iowa Code § 321J.2(1)(*c*). Schories pled not guilty, and the case proceeded to trial. At the close of evidence, Schories moved for a judgment of acquittal based on the prescription drug defense, arguing it was clear that the methadone found in Schories's urine was consistent with his prescription for methadone and that the State had failed to prove beyond a reasonable doubt that he was not taking it in accordance with the instructions of his physician or in accordance with the labeling instructions of the pharmacy. The court denied the motion and the jury found Schories guilty. Because Schories argues his conviction cannot be sustained on the basis that the jury's findings were not supported by substantial evidence, we summarize the evidence offered at trial.

**A. Testimony of Officer Boone.** The State called Officer Boone as its sole witness at trial. Officer Boone has received three weeks training as a drug recognition expert. In addition to his ordinary police work, Boone has taught drug recognition courses at the Iowa Law Enforcement Academy for the past two years.

On August 27, he was on routine patrol on East 14th Street in Des Moines. According to Boone, around 11:15 p.m. he observed a vehicle that "left the pack I was in and caught the pack in front of him."

Based on this observation, Officer Boone suspected the vehicle was speeding. The vehicle then made a few lane changes without using a turn signal. Further, Officer Boone noticed that the vehicle was following another vehicle by a distance of only one car length in a 35-mile-per-hour zone. Considering the driving of the vehicle "erratic," Officer Boone decided to make a traffic stop.

Schories was the driver of the vehicle. Officer Boone observed that Schories had "bloodshot, watery eyes" and a "deep raspy voice." Officer Boone further observed that when Schories exited the vehicle, he had "improper balance" and "slow" movements. According to Officer Boone, Schories "didn't seem like—like he was acting what I would call normal."

Based on his observation, Officer Boone asked Schories to submit to a horizontal gaze nystagmus test. A horizontal gaze nystagmus test involves determining whether the eyes jerk involuntarily when a stimulus moves from side to side. Schories's eyes tracked smoothly.

Officer Boone also asked Schories to perform what is known as a Rhomberg test. The Rhomberg test asks a person to tip back his head and estimate the moment when thirty seconds has elapsed. During the test, Officer Boone observed Schories "swaying back and forth." Schories estimated thirty seconds had elapsed when twenty-two seconds had passed. Boone also obtained consent for a preliminary breath test, which did not indicate the presence of alcohol.

Schories asked Officer Boone to retrieve his wallet and cell phone from the car. When Officer Boone looked for the wallet and cell phone in the car, he found an orange syringe between the seat and the center console. The syringe, however, was not preserved for evidence or testing by law enforcement. The car was not registered to Schories, but

belonged to another person who is identified but not further described in the record.

Officer Boone also discovered an unmarked pill bottle in Schories's front pocket when he patted him down. Officer Boone checked the pills against his "drug bible," a book he kept in his police vehicle that contained descriptions of various drugs. Using the drug bible, Officer Boone specifically identified the pills found in the unmarked pill bottle as methadone and hydromorphone, two controlled substances.

Officer Boone took Schories to the Des Moines police station for further examination. Schories consented to a data master breath test which, like the preliminary breath test administered at the traffic stop, showed no indication of alcohol. Schories also told Boone that he had taken a hydromorphone at 8:00 p.m. or 9:00 p.m. that evening.

Officer Boone next examined Schories for physical signs of drug use. He again observed "droopy eyelids, bloodshot, watery eyes" and pupils that were "a little constricted." His pulse was a "little high" at 100 beats per minute, with normal being in the range of 60 to 90 beats per minute.

Officer Boone examined Schories's eye function. He again administered the horizontal gaze nystagmus test, which was negative. He also performed the lack of convergence test, during which the examiner makes two circles in front of the suspect's nose with a finger and then touches the tip of the nose to determine if the eyes of the suspect converge. Schories's eyes did not converge. Officer Boone testified, however, that twenty percent of the population cannot converge their eyes even when not under the influence of drugs.

Officer Boone next administered the Rhomberg test for the second time. This time, Schories estimated thirty seconds had elapsed in

twenty-four seconds. Officer Boone observed eye tremors and front-to-back swaying while administering the test. Officer Boone then asked Schories to perform a walk-and-turn test. During the walk-and-turn test, Officer Boone concluded that Schories demonstrated three of eight criteria showing the influence of a drug. Officer Boone also conducted a finger-to-nose test, during which Schories was asked to touch the tip of his nose. Schories missed the tip of his nose four times out of six attempts. Officer Boone concluded Schories's coordination was off. Officer Boone did not ask Schories to perform a one leg stand test, however, in light of Schories's assertion that his back injuries made it problematic for him to perform.

Officer Boone again took Schories's pulse, which he found to be at 104 beats per minute. Schories's blood pressure was also high, 160 over 98. His body temperature was low, 96.8 degrees Fahrenheit. Officer Boone also measured Schories's pupils in a dark room and found that they were on "the constricted side of normal." Further, Officer Boone observed that Schories's muscles were "flaccid."

Officer Boone examined Schories's arms and hands for injection sites. He saw bruising over the veins of both arms and red marks that resembled track marks. Because of the lack of pus oozing from the sites, Officer Boone concluded the injections did not occur "within the last few hours," but instead occurred "within a day or two." Officer Boone stated that hydromorphone and methadone can be injected.

Based on "the totality of circumstances," Officer Boone believed Schories was under the influence of a narcotic. Schories consented to providing a urine sample for chemical testing. His urine tested positive for methadone.

During the investigation, Schories told Officer Boone he was under the care of a physician for pain management and had prescriptions for methadone and hydromorphone. Schories told Boone that he had taken both drugs that day.

On cross-examination, Officer Boone admitted he was not a doctor, that a lot of drivers speed or follow cars too closely who are not under the influence of a drug, and that raspy and slurred speech, bloodshot eyes, and droopy eyelids can be caused by other things besides use of narcotics. With respect to the syringe, Officer Boone admitted that the car did not belong to Schories and that he had not tested it for drugs. Boone testified, "I secured [it] in our syringe container. . . . They dispose of them properly because they are medical and biological hazards." Officer Boone admitted he did not find the other elements of a "hype kit" such as a handle, elastic band, cooker, matches, lighter, tourniquet, or cottons in the vehicle driven by Schories. Officer Boone recognized that the mere presence of an injection site does not mean someone is under the influence of a drug. While the version of the National Highway Traffic Safety Administration manual that was used when Officer Boone was trained in 2006 or 2007 stated that methadone cannot be injected, he believed that version was not "up to date" based upon what he had read on the Internet. When asked by the State on redirect examination whether methadone could be reduced to a liquid state and then transported, Officer Boone responded that it "could." Officer Boone admitted he initially believed Schories was under the influence of marijuana based on his observations, but that subsequent chemical testing was negative for the presence of marijuana.

Schories's counsel also probed the validity of certain physical indicators cited by Officer Boone in his direct examination. Officer Boone

admitted a person who has taken a narcotic analgesic, such as methadone, should have a lower-than-normal pulse rate and blood pressure, not higher-than-normal signs as exhibited by Schories. He also admitted the Rhomberg test and finger-to-nose test had not been scientifically validated. He admitted he did not observe a number of symptoms of use of narcotic analgesics, such as drowsiness, dry mouth, euphoria, facial itching, and slow breathing.

**B. Testimony of Dr. Daniel Baldi.** Schories called his physician, Dr. Daniel Baldi, as a witness in support of his defense. Dr. Baldi's substantive testimony can be summarized as follows. Since the early 2000s, Dr. Baldi has treated Schories for chronic back pain following back surgery. For a couple years prior to Schories's arrest, Dr. Baldi prescribed methadone and hydromorphone for Schories for pain management. He testified methadone has a long half-life and provides long-term relief while hydromorphone is taken for break-through pain. Dr. Baldi prescribed two eight-milligram tablets of hydromorphone to be taken three times a day, plus one additional tablet at bedtime. He also prescribed four ten-milligram tablets of methadone to be taken in the morning, two in the afternoon, and two at bedtime.

Dr. Baldi did not specifically have a discussion with Schories concerning driving while using the medication and did not advise Schories to refrain from driving while taking the drugs. Dr. Baldi administered random drug tests on Schories. With the exception of one time in the "distant past" when he tested positive for marijuana, Schories never tested positive for any drug other than those prescribed. Dr. Baldi testified he could not recall any occasion where Schories ran out of his prescription too soon and noted that it had not been a recent problem for Schories. He stated that he saw no abuse of the drug by Schories and

that if he had, he would have taken appropriate steps such as seeing him more frequently, taking him off the medication, giving him less medication, giving him more drug screens, or ending the doctor–patient relationship in the event of illegal abuse.

On cross-examination, Dr. Baldi was presented monographs for methadone and hydromorphone issued by Hy-Vee. The monographs are several pages of print that accompany a prescription obtained from a pharmacy. The monographs for both methadone and hydromorphone state: "This drug may make you dizzy or drowsy. Do not drive, use machinery, or do any activity that requires alertness until you are sure you can perform such activity safely." The monographs were admitted into evidence over Schories's objection.

Dr. Baldi stated both methadone and hydromorphone are addictive. He further testified that he did not prescribe that the drugs be injected and that he would have been concerned if he had observed Schories with somnolence or dizziness. He testified that he would be surprised if Schories was driving erratically, that he had driven beside him coming home from work without observing any problems, and that hundreds of persons receive methadone shots each morning at two local clinics and subsequently drive to work. He further testified that while constricted pupils are a common side effect of all opioids, to the best of his knowledge, nystagmus, or the jerking of the eye, is not.

## II. Standard of Review.

We review challenges to the sufficiency of the evidence for correction of legal errors. *State v. Heard*, 636 N.W.2d 227, 229 (Iowa 2001). Further, we review de novo the constitutional claim of ineffective assistance of counsel. *State v. Risdal*, 404 N.W.2d 130, 131 (Iowa 1987).

**III. Sufficiency of the Evidence.**

**A. Issue Preservation.** Schories's counsel moved for judgment of acquittal for failure of the State to present sufficient evidence both on the substantive crime and on the prescription drug defense. On appeal, Schories presses only the latter claim.

The State suggests that Schories did not properly preserve the issue at trial because Schories "did not challenge the State's evidence disproving his prescription medication defense." As a result, the State argues the only avenue to review the issue is through a claim for ineffective assistance of counsel. *See, e.g., State v. Fountain,* 786 N.W.2d 260, 263 (Iowa 2010).

Schories counters that he recognizes we have required counsel to point out specific deficiencies in the evidence in the district court. *See State v. Crone,* 545 N.W.2d 267, 270 (Iowa 1996). He claims, however, that his motion was sufficient to preserve the issue. In the alternative, Schories urges us to consider the challenge as a claim of ineffective assistance of counsel.

In making the motion for acquittal, Schories's counsel asserted the State had presented insufficient evidence to overcome the prescription drug defense because the evidence demonstrated Schories had a prescription for the methadone found in his urine and was taking the drug in accordance with the directions of his physician and the pharmacy. Although the statement was conclusory, counsel did identify the elements of the affirmative defense for which the State allegedly had insufficient evidence. In *Crone,* we emphasized that in order to preserve error on a motion to acquit, the defendant must specifically identify the elements for which there was insufficient evidence. *Id.*; *see also State v. Geier,* 484 N.W.2d 167, 170 (Iowa 1992) (finding no preservation where,

in motion to acquit, defendant did not state that stun gun does not satisfy element of "dangerous weapon"). However, to the extent Schories stated the evidence showed that he had a prescription for methadone and that he was taking the drug in accordance with the directions of his physician and in accordance with the labeling instructions of the pharmacy, he has preserved error on this issue.[1]

In any event, the question of preservation hardly matters because Schories may raise the issue through a claim of ineffective assistance of counsel. It would surely be ineffective under the standards announced in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984),[2] if Schories's counsel failed to preserve a valid motion for acquittal based on the State's lack of substantial evidence tending to disprove the elements of the prescription drug defense. Further, the prejudice prong would obviously be satisfied where acquittal would have resulted if trial counsel had preserved the motion. Finally, there is no conceivable strategic reason for failing to preserve a potentially valid motion to dismiss for lack of sufficient evidence. Therefore, in order to determine the ineffectiveness issue on this appeal, we are only required

---

[1]Schories's counsel did not raise a sufficiency-of-the-evidence challenge on the question of whether Dr. Baldi had instructed Schories not to drive. At trial, however, the State made no claim that Dr. Baldi had instructed Schories not to drive and neither party proposed an instruction on the issue. Because this issue was not contested at trial, Schories's counsel had no obligation to specifically raise a claim of lack of evidence based upon it.

[2]Although Schories makes an ineffectiveness claim under both the Sixth Amendment of the United States Constitution and article I, section 8 of the Iowa Constitution, he asserts the test announced in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), is the appropriate test under both constitutions. Where counsel does not assert a different standard under the Iowa Constitution than that developed by the United States Supreme Court under the Federal Constitution, we ordinarily apply the test advocated by the parties, but reserve the right to apply the test in a different manner. *E.g.*, *NextEra Energy Res. LLC v. Iowa Utils. Bd.*, 815 N.W.2d 30, 45 (Iowa 2012).

to determine whether the motion would have been meritorious even if the sufficiency of the evidence challenge had not been preserved.

**B. Merits of Motion for Acquittal Based on Insufficient Evidence.** There is no question that a reasonable fact finder could conclude that Schories was driving a vehicle on August 27 when a controlled substance, methadone, was in his system, as shown by the urine test. Thus, the basic elements of the offense established in Iowa Code section 321J.2(1)(*c*) were uncontested and clearly established. The fighting issue is whether Schories was entitled to acquittal as a matter of law based on the evidence presented relating to the prescription drug defense. *See* Iowa Code § 321J.2(7)(*b*). Once a defendant has presented evidence sufficient to show the prescription drug defense applies, the State has the burden of disproving each element of the defense beyond a reasonable doubt. *See, e.g., State v. Lawler*, 571 N.W.2d 486, 489 (Iowa 1997). It is undisputed that Schories had a valid prescription for methadone at the time of his arrest. The question thus becomes this: was there substantial evidence in the record to support the jury's conclusion that Schories at the time of his arrest was not taking methadone according to his physician's instructions and the labeling directions of the pharmacy?

Schories claims there was not sufficient evidence to support the jury verdict because there was no evidence that he failed to take the prescription drugs as directed by his doctor or the pharmacy. According to Schories, once a valid prescription is established, the State must then show that Schories did not take the prescription as directed by his physician or pharmacy. According to Schories, the State proved only methadone use, not methadone abuse. The State counters with three theories to sustain the jury verdict.

1. *Substantial evidence based on behavior and symptoms.* The first substantial evidence theory offered by the State is based on a series of inferences that the State claims the jury was entitled to draw based on the behavior and symptoms exhibited by Schories on August 27. According to the State, a reasonable jury could infer that Schories's erratic driving and difficulty with various tests on the night in question resulted from methadone intoxication. The State further asserts a reasonable jury could conclude that because Schories had been under the supervision of Dr. Baldi in connection with his methadone prescription for a period of approximately two years, Schories would have reported to Dr. Baldi if he had been experiencing serious side effects from taking the drug. If Schories had reported serious side effects, the State argues, a reasonable jury could conclude that Dr. Baldi would have then adjusted the dosage until the side effects were alleviated. In other words, according to the State, a reasonable jury could infer that Schories, if he was taking methadone as prescribed by Dr. Baldi, would not have been experiencing the side effects exhibited on August 27 because such side effects would have been reported to Dr. Baldi earlier and would have led to an adjustment in the prescription. Thus, according to the State, a reasonable jury could conclude that Schories was taking methadone in excess of the amount prescribed by Dr. Baldi.

The problem with this theory is that the behavior and symptoms exhibited by Schories on August 27 were comparatively mild. Without expert testimony, the evidence is not sufficiently strong to allow a reasonable jury to conclude beyond a reasonable doubt that Schories was abusing rather than simply using methadone according to his prescription. *See State v. Lawson*, 913 A.2d 494, 504–05 (Conn. App. Ct. 2007) (holding that expert testimony is required to link a trace amount of

methadone to a driving impairment); *State v. Bealor*, 902 A.2d 226, 237–38 (N.J. 2006) (noting that expert testimony is preferred on a cause of intoxication other than alcohol). While the State established that methadone was in Schories's urine, it did not introduce any evidence regarding the amount of methadone in his urine. The mere presence of methadone does not establish misuse because its presence could have been the product of valid use consistent with his prescription. Similarly, the mere facts that Schories changed lanes multiple times or sped from one pack of cars to another do not establish misuse. *See People v. Vente*, 970 N.E.2d 578, 579–80 (Ill. App. Ct. 2012) (driving in a lane improperly and making an improper turn do not, standing alone, show an unlawful consumption of controlled substance). While Dr. Baldi was generally asked whether the erratic driving of a patient on methadone would be a subject of concern, he was not specifically asked whether the driving observed on the night in question, in addition to the symptoms observed by Officer Boone, suggested Schories was abusing methadone. Further, a pain patient who experienced the mild side effects arguably established by the record would not necessarily report them to his physician. We therefore conclude the inferences the State asked the jury to draw were too speculative to support a jury verdict of guilt beyond a reasonable doubt. *See State v. Truesdell*, 679 N.W.2d 611, 618 (Iowa 2004).

2. *Substantial evidence of violation of labeling instructions.* The State argues it offered substantial evidence from which a jury could conclude beyond a reasonable doubt that Schories violated the labeling directions provided by his pharmacy by driving a vehicle on August 27. The State offered into evidence the monographs for methadone and hydromorphone. These monographs provide details about the drugs, their side effects, and appropriate usages. Both monographs stated:

"This drug may make you dizzy or drowsy. Do not drive, use machinery, or do any activity that requires alertness until you are sure you can perform such activity safely." Dr. Baldi testified that these monographs are provided to a consumer by the pharmacy when the prescription is filled.[3] The State argues there was substantial evidence Schories violated the instruction in the monograph that he should not drive until he was sure he could do so safely. The nub of the State's argument is Schories's behavior and symptoms on August 27 demonstrated that he objectively could not drive safely and that from these facts a jury could conclude beyond a reasonable doubt Schories drove his vehicle when he was not sure he could do so safely.

The record contains evidence that Schories was driving in a less than optimum manner and in a fashion that would to some extent increase the risk of harm to himself and others. Many people drive in this fashion, however, without being under the influence of methadone or any other drug. We do not think there is sufficient evidence in this record for a jury to conclude beyond a reasonable doubt that Schories was not sure he could perform the activity of driving safely as a result of methadone usage when he drove on the night in question. There is no evidence Schories had been warned in the past that he should not drive because of the side effects of methadone. There is no evidence in the record of previous mishaps or problems that might have put Schories on notice that he should not be driving while taking methadone. Further, we think the State's theory requires a sense of self-awareness that is not

---

[3]On appeal, Schories does not question that the monographs are part of the labeling instructions of a prescription drug. The Food, Drug, and Cosmetic Act defines "labeling" as including any written material accompanying the drug. *See* 21 U.S.C. § 321(m) (2006) (labeling includes "all labels and other written, printed, or graphic matter (1) upon any article or any of its containers or wrappers, or (2) accompanying such article").

likely to be exhibited by many persons taking prescription drugs. We conclude there is insufficient evidence for a jury to conclude beyond a reasonable doubt that Schories was not sure, on August 27, that he could drive safely.

3. *Substantial evidence of unauthorized injection of methadone.* The State argues it offered sufficient evidence to allow a reasonable jury to conclude beyond a reasonable doubt that Schories was injecting the methadone, a procedure not directed by his physician. On August 27, Schories exhibited track marks and bruising on both arms. Further, police found a syringe in the car he was driving at the time of his arrest. Schories had also been driving erratically and arguably exhibited some symptoms of methadone use. Thus, the State claims that a reasonable jury could infer beyond a reasonable doubt that Schories was taking methadone by injection and that this unauthorized use was the cause of the behavior and symptoms of methadone intoxication.

We are unconvinced by this last theory. While Schories had track marks and bruising on his arms on the night of his arrest, Officer Boone testified he did not see any oozing from the track marks and offered his opinion that the bruises and track marks were a day or more old. Further, Schories asserted he had taken methadone on the day of his arrest. While Schories could have injected methadone at some point prior to his arrest, the record is silent as to how long methadone remains in a person's urine when it is injected. Thus, even if Schories had injected methadone, there is no evidence in the record that would permit a reasonable jury to infer that the methadone measured in Schories's urine on August 27 was taken by injection as opposed to another method consistent with the directions of his physician and the pharmacy. Further, the track marks could have resulted from the injection of

something other than the methadone that was measured in Schories's system on August 27. Finally, the jury was left to speculate as to whether methadone could be injected. Officer Boone testified the National Highway Transportation Safety Manual upon which he was trained indicated methadone could not be injected, but added that his unidentified searches on the Internet suggested the manual was incorrect. Thus, although it is clear there has been some needle activity on Schories's arms in the past, there was no evidence of needle activity on the day of his arrest, no evidence of how long methadone remains in a person's urine after injection, and no direct evidence that the tracks and bruising were a result of the injection of the methadone that was present in his urine on August 27. As with the other theories, we conclude the evidence is simply too speculative for a jury to conclude beyond a reasonable doubt Schories had injected the methadone measured in his urine on August 27.

## IV. Conclusion.

We conclude there was insufficient evidence for a jury to conclude beyond a reasonable doubt the State disproved Schories's prescription medication defense to operating while intoxicated. As a result, the judgment of the district court is reversed. Because jeopardy has attached to the defendant, the district court on remand shall enter judgment for the defendant.

**REVERSED.**

All justices concur except Waterman, Mansfield, and Zager, JJ., who dissent.

**WATERMAN, Justice (dissenting).**

I respectfully dissent because I conclude the evidence was sufficient to sustain Schories's conviction for operating a motor vehicle while under the influence of a controlled substance in violation of Iowa Code section 321J.2(1)(*c*) (2009), notwithstanding his defense that he was prescribed methadone by Dr. Daniel Baldi. The majority usurps the role of the jury by dissecting the State's rebuttal of the prescription-drug defense into separate, distinct theories and finding the evidence insufficient for each unique theory viewed in isolation. That is not how the case was tried and submitted to the jury that convicted Schories, nor should that approach govern appellate review for sufficiency. It was undisputed that Schories had methadone in his system when driving and the only fighting issue was whether he was using it in compliance with instructions. We must examine the entire trial record in the light most favorable to the verdict. The aggregate evidence was more than sufficient to support the jury's rejection of his prescription-drug defense. *See* Iowa Code § 321J.2(7)(*b*) (requiring proof defendant took prescribed drug as instructed by his physician and the labeling directions of the pharmacy).

Schories was lawfully stopped by Officer Boone for erratic driving—speeding, repeated lane changes, and tailgating. The majority equates Schories's manner of driving to that of many sober drivers. But, neither Schories nor the majority contends Officer Boone lacked probable cause for this traffic stop. Next, we have Officer Boone's close observation of Schories's symptoms and behavior on the side of the road and at the police station. Officer Boone testified Schories had "improper balance" and moved slowly getting out of the vehicle. His speech was slurred. His coordination was off. He displayed visible signs of impairment on several

field tests for sobriety. He failed to touch his finger to his nose four times out of six. He "sway[ed] back and forth" when asked to tilt his head back. He showed three signs of impairment on the walk-and-turn test. He had watery, bloodshot eyes; eye tremors; droopy eyelids; and constricted pupils. He failed an eye convergence test that eighty percent of people can pass when sober. Officer Boone, based on all his personal observations, testified he believed Schories was under the influence of a narcotic. The majority, relying on its review of the cold transcript, characterizes Schories's behavior and symptoms the night of his arrest as "comparatively mild." I defer to the jury that apparently had a different take on Officer Boone's live testimony.

Schories had needle track marks on his arm and a syringe within his reach in the vehicle he was driving alone. He had both methadone and hydromorphone pills with him. Schories tested positive for methadone in his urine.

The pharmacy's instructions accompanying Schories's methadone prescription state: "This drug may make you dizzy or drowsy. Do not drive, use machinery, or do any activity that requires alertness until you are sure you can perform such activity safely." Dr. Baldi testified methadone is addictive and has a long half-life. Dr. Baldi further testified he will make adjustments for patients who report methadone affects their driving. Schories had been taking prescription methadone for two years—ample time to work with Dr. Baldi on the appropriate dosages to avoid impaired driving. Schories was to take the methadone orally. Injecting it would constitute abuse. Schories offered no explanation at trial for the syringe in his passenger compartment or the needle tracks on his arm.

Officer Boone's unthinking disposal of the syringe in the biohazard container is regrettable. The opportunity was lost to test the syringe for

methadone or the DNA of Schories or another. But, the majority stops short of contending evidence of the syringe should have been suppressed, a remedy defense counsel never requested at trial. The jury was entitled to consider the presence of the syringe in the vehicle within Schories's reach, together with the needle tracks on his arm and his multiple behavioral and symptomatic signs of impairment.

The foregoing evidence in the aggregate was sufficient for a jury to find Schories either injected the methadone *or* ingested too much, contrary to the instructions from his physician or pharmacy.

The majority errs by rejecting an injection theory based on Officer Boone's speculation the needle tracks on the arm were not made "within the last few hours" because there was no pus oozing out at the time of his arrest. I find it inconsistent for the majority to credit Officer Boone's lay opinion on the age of Schories's needle marks while rejecting Officer Boone's opinion that Schories was under the influence of a narcotic based on his observed behavior and symptoms. An appellate court should not cherry-pick testimony from the same witness to believe and disbelieve in the guise of determining the sufficiency of the evidence. It is the jury's role to weigh the evidence and decide what testimony is credible.

Theoretically, it is *possible* that Schories was using methadone in compliance with his physician's instructions, despite his erratic driving, his drugged appearance, the syringe in the car, and the track marks on his arm. But, a jury was entitled to find otherwise.

The jury reasonably could conclude at least one of the needle tracks was less than a day old or infer Schories injected himself in a fresh spot Officer Boone did not examine, or find that at the time of his arrest Schories remained impaired by methadone previously injected in his arm. On this record, a reasonable jury could find Schories violated

Dr. Baldi's instructions by injecting the methadone. Alternatively, the jury could find Schories took more methadone in pill form than permitted by the labeling instructions.

The majority opinion will require expert testimony in more OWI, prescription-drug-defense cases. The majority asserts: "Without expert testimony, the evidence is not sufficiently strong to allow a reasonable jury to conclude beyond a reasonable doubt that Schories was abusing rather than simply using methadone according to his prescription." Thus, the majority questions the lack of evidence that methadone can be injected and faults the lack of expert testimony as to how long injected methadone would remain detectable in a person's urine. Yet, the majority cites no Iowa case or other persuasive authority requiring expert testimony to show defendant was abusing a prescription drug when other signs of impairment are present. The two cases cited by the majority do not support requiring expert testimony here.

The majority relies solely on *State v. Lawson*, 913 A.2d 494, 504–05 (Conn. App. Ct. 2007), for the proposition that "expert testimony is *required* to link a trace amount of methadone to a driving impairment." (Emphasis added.) Yet, that case is inapposite. There, the appellate court affirmed the conviction of a drunk driver who caused a fatal collision by turning into the path of the victim–motorcyclist, who braked and swerved but was unable to avoid the impact. *Lawson*, 913 A.2d at 496. "The victim was thrown from the motorcycle and died as a result of the collision." *Id.* An autopsy revealed a *trace* amount of methadone in the victim's blood. *Id.* at 503. There was no evidence the victim was driving erratically or was otherwise impaired. Lawson argued the jury should have been allowed to consider evidence of the trace amount of methadone in the victim's blood, despite the lack of any "testimony as to the effect of the drug on the victim's ability to operate the motorcycle."

*Id.* at 504. The appellate court disagreed and affirmed Lawson's conviction because "there was no evidence that any impairment [of the *victim*] could constitute an independent and intervening cause of the collision." *Id.* at 505. *Lawson* simply did not adjudicate whether expert testimony is required to prove a *defendant* was abusing methadone.

The second case cited by the majority actually affirmed the defendant's conviction for impaired driving without expert testimony and reversed the intermediate appellate court decision requiring expert testimony. *See State v. Bealor,* 902 A.2d 226, 237–38 (N.J. 2006). The majority merely cites *Bealor* for the proposition that "expert testimony is *preferred* on a cause of intoxication other than alcohol." (Emphasis added.) I agree. Expert testimony may well assist the jury in prescription-drug-defense cases, but should not be required when other admissible evidence supports the finding of impaired driving. Indeed, in *Bealor,* the New Jersey Supreme Court held that the arresting officer's lay observations of defendant's impairment and the presence of marijuana in his bloodstream were sufficient to convict him, without expert testimony the drug impaired his driving. *Id.* at 236 ("The aggregate of those proofs was more than sufficient to permit the fact-finder to conclude, beyond a reasonable doubt, that the defendant violated the driving while intoxicated statute."). The same is true here.

In contrast to these two cases, I would commend to the majority the well-reasoned decision of the Pennsylvania Supreme Court, which specifically rejected an expert testimony requirement in a similar case involving impaired driving and a prescription-drug defense. *See Commonwealth v. Griffith,* 32 A.3d 1231, 1238–39 (Pa. 2011).

Prescription-drug abuse is a growing problem nationally and in Iowa. Our laws prohibiting impaired driving are intended to save lives and make our roads safer. *See State v. Comried,* 693 N.W.2d 773, 775–

78 (Iowa 2005) (affirming conviction for vehicular homicide based on trace amount of methamphetamine in defendant's blood). We noted the purpose of Iowa Code chapter 321J is "to reduce the holocaust on our highways" caused in part by intoxicated drivers. *Id.* at 775 (citation and internal quotation marks omitted). In *State v. Garcia*, 756 N.W.2d 216 (Iowa 2008), we reiterated that the purpose of chapter 321J is " 'to help reduce the appalling number of highway deaths resulting in part at least from intoxicated drivers.' " *Garcia*, 756 N.W.2d at 220 (quoting *State v. Wallin*, 195 N.W.2d 95, 96 (Iowa 1972)). We should not undermine chapter 321J by playing Monday morning quarterback to second-guess juries or by superimposing a requirement of expert testimony when the aggregate record evidence is sufficient to prove prescription-drug abuse. Unfortunately, the majority's *de facto* expert testimony requirement will raise the cost of prosecuting OWIs based on prescription-drug abuse.

The district court correctly denied Schories's motion for judgment of acquittal challenging the sufficiency of the evidence. Schories raised other issues including errors in the jury instructions. I agree with Schories that the jury instructions given may have confused the jury as to who had the burden of proof concerning his prescription-drug defense. The instructional error entitles him to a new trial. I will refrain from addressing the other issues not reached by the majority because its holding today requires dismissal of the charges against him without a retrial.

Mansfield and Zager, JJ., join this dissent.