# IN THE COURT OF APPEALS OF IOWA

No. 15-1806
Filed February 22, 2017

**STATE OF IOWA,**
Plaintiff-Appellee,

**vs.**

**TONY WANGMENG LEE,**
Defendant-Appellant.

_____

Appeal from the Iowa District Court for Buena Vista County, Don E. Courtney, Judge.

Tony Wangmeng Lee appeals following judgment entered upon convictions for two counts of forced consent to termination of pregnancy, assault while participating in a felony, and tampering with a witness or juror. **REVERSED IN PART, AFFIRMED IN PART, AND REMANDED WITH DIRECTIONS.**

Mark C. Smith, State Appellate Defender, and Mary K. Conroy, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, and Tyler J. Buller, Assistant Attorney General, for appellee State.

Heard by Danilson, C.J., and Vogel and Vaitheswaran, JJ.

**DANILSON, Chief Judge.**

Tony Wangmeng Lee appeals following judgment entered upon convictions for two counts of violating Iowa Code section 707.8(5) (2013) (by force or intimidation procuring consent to termination of pregnancy),[1] one count of violating section 708.3 (assault while participating in a felony), one count of violating section 720.4 (tampering with a witness), and two counts of assault, which were found as lesser-included offenses of other charges.

The fundamental question presented by this appeal is whether the offense defined in section 707.8(5) requires the actual termination of a pregnancy. If the offense requires actual termination of pregnancy, the trial was marred by instructional error prejudicial to the defendant, and we must reverse.

Because section 707.8(5) requires a resulting termination of a pregnancy, and there is no evidence the 2014 pregnancy was terminated before April 25, 2014, the convictions for procuring consent to termination of pregnancy by force or intimidation and assault while participating in a felony entered on counts 4, 5, and 8 must be reversed. We affirm the convictions for tampering with a witness (count 10) and two counts of assault (counts 2 and 9). We remand for a corrected judgment, including a conviction of the lesser-included offense of assault for count 8, and re-sentencing on all remaining convictions in accordance with this opinion. Costs on dismissed charges shall not be charged to the defendant.

---

[1] Lee was charged with an additional three counts of violating section 707.8(5). One count alleging conduct on May 25, 2014, was dismissed prior to trial, and the jury acquitted him on two counts (one concerning a terminated pregnancy in December 2012 and the other concerning allegations occurring in March through April 2014).

**I. Background Facts and Proceedings.**

Lee went to Laos in 2010 to meet and marry M.V. When Lee brought M.V. to the United States in June 2011, Lee's former wife, O.L.,[2] was still living with him and was pregnant with his child. M.V. did not speak, read, or write English and had no relatives in the United States.

In April 2012, M.V. called police and reported Lee had beaten her. Lee was arrested, and M.V. obtained a domestic abuse no-contact order against Lee. In May 2012, a letter purportedly prepared on M.V.'s behalf by M.V.'s nephew, Vamntxawg Lee, was filed with the court in which it was denied there had been any domestic abuse. The letter requested that the court drop the no-contact order. The letter was delivered to the district court, M.V. did not appear for a scheduled hearing, and the no-contact order and domestic abuse case were dismissed.

In September 2012, M.V. became pregnant. On October 31, 2012, M.V. went to a community health center reporting she was pregnant and having abdominal pain. M.V. stated she had taken medications for headaches, after which she had begun to cramp and bleed. An ultrasound showed she was approximately five weeks pregnant. On February 4, 2013, however, an ultrasound found no evidence of pregnancy.

M.V. was pregnant again at the end of December 2013. On April 21, 2014, Lee took M.V. to the emergency room (ER) and acted as her translator. M.V. was four months pregnant and presented with symptoms of bleeding and

---

[2] Lee met and married O.L. in Laos in 2006. O.L. then came to the United States. Lee divorced O.L. in 2008 but continued to live with and have sex with her until 2011.

cramping. The ER records indicate medical personnel initially thought M.V. was in the process of having a miscarriage. However, M.V.'s condition was stabilized, and Lee left her to go to work. The on-call obstetrical physician, Dr. Jason Huisenga, diagnosed M.V. with an incompetent cervix and recommended she be evaluated in Omaha for cerclage, that is, "a stitch that can be placed in the cervix to try to hold it closed." Through a language line (an interpretation phone service), it was explained to M.V. that she could be transferred to Omaha for this procedure to continue her pregnancy.

The nursing notes indicate:

> Patient states she is worried about her bleeding and if the baby's brain is okay. She states a baby whose brain is not okay is very hard to care for. Dr. Huisenga reassures patient there is no indication that there is any problem with the baby.
> . . . .
> This RN continues to reinforce what Dr. Huisenga has stated. Patient states she does not want to be transferred and wants to be given the medicine to make her baby come out. States she is worried about the baby not being okay due to her bleeding and baby movement against the cervix.
> This RN informed the patient that baby moving is a sign of good baby health and the baby has a strong heartbeat. Informed patient that it is likely that the bleeding she has been having is potentially from her cervix as it has been shortening. Patient states she would like to speak with her husband before deciding to do anything. Patient's husband called at work and asked to return to the hospital.

When Lee returned, he told personnel he and M.V. would "like to sign papers to allow her to go home so they can do some cultural rituals and blessings for mom and baby." The nurse described Lee as "kind of dominating, appeared to be dominating in the relationship." M.V. was released against medical advice.

Lee brought M.V. to a follow-up appointment with Dr. Huisenga on April 24. Dr. Huisenga's notes from that meeting state, in part:

> Strongly recommended consultation with perinatologist to see if she is a candidate for a cerclage. She continues to decline citing religious beliefs but will reconsider if fetus is still viable on Monday. I will plan to see her on Monday. Husband served as interpreter today and verbalized understanding that failure to act could result in a fetal demise.

Dr. Huisenga did not see the two again.

In June 2014, Lee wrote to the United States Department of Homeland Security, informing the department that M.V. received her permanent resident status approval on January 16, 2014, and then "quickly file[d] for a divorce and move[d] out."

On August 11, M.V. reported to police that her car had been vandalized while she was at work and that she suspected Lee because he had a key to her car. When questioned, Lee admitted to police he had placed salt in M.V.'s gas tank because he was angry after seeing M.V. with another man.

On October 1, 2014, M.V. went to the police, taking with her a large knife she reported was Lee's.[3] The knife had the name "Tony" written on the handle. She stated Lee had threatened her with the knife to have sex with him while she was pregnant and that he had forced her to take pills to end her pregnancy. In a subsequent police interview, Lee acknowledged the knife was his. Lee told police M.V. had chosen to force her own miscarriages by taking pills. He denied forcing her to have sex with him or to take pills. He also denied making some statements that medical personnel had documented in their medical reports.

---

[3] The police referred to the knife as a machete.

On November 4, 2014, Lee was charged with ten counts, as outlined below:

| Count 1 | Second-degree sexual abuse, using a dangerous weapon (December-April 2014) |
|---|---|
| Count 2 | Second-degree sexual abuse, using a dangerous weapon (December-April 2014) |
| Count 3 | Forcibly procuring consent to termination of pregnancy (September-October 2012) |
| Count 4 | Forcibly procuring consent to termination of pregnancy (February 14, 2014) |
| Count 5 | Forcibly procuring consent to termination of pregnancy (March 2014) |
| Count 6 | Forcibly procuring consent to termination of pregnancy (March-April 2014) |
| Count 7[4] | Forcibly procuring consent to termination of pregnancy (May 25, 2014) |
| Count 8 | Assault while participating in felony (forcibly procuring consent to termination of pregnancy on February 14, 2014) |
| Count 9 | Assault while participating in felony (forcibly procuring consent to termination of pregnancy in March 2014) |
| Count 10 | Tampering with witness on May 7, 2012 |

The State indicated it intended to call Lee's former wife, O.L., to testify Lee had forced her to take pills to end pregnancies in 2008 and 2009. Lee moved in limine to exclude O.L.'s prior-bad-acts testimony. After hearing oral arguments on the motion, the trial court ruled O.L. would be allowed to testify, finding "that the [proposed] evidence is relevant to the facts in dispute," adopting "the State's argument regarding clear proof," and concluding the probative value outweighed the prejudice.

Lee, M.V., and O.L. required Laotian or Hmong interpreters. The proceedings were continued on a number of occasions due to the need for and lack of interpreters. Shortly before the September 15, 2015 trial Lee moved to continue trial until November 10 on grounds there was only one certified Hmong

[4] Count 7 was dismissed before trial.

interpreter available for the trial as scheduled, and two interpreters were needed (one at defense table and one interpreting witness testimony). After the hearing, the court denied the motion to continue, finding Kabo Yang, though not certified in Iowa, was qualified to interpret, and there was no guarantee as to the availability of certified interpreters for the proposed date of continuance.

At trial, M.V. testified that when she was pregnant in September 2012, Lee did not want her to be pregnant and told her to have an abortion. M.V. stated she did not want to have an abortion. Lee then "brought some medication and forced me to take it." She stated, "He said for me to take it. If I don't take it, then he was not going to proceed with my documents to stay in this country and he would send me back to Laos." M.V. testified that about three or four hours after taking the pills, she started to bleed and she eventually miscarried.

M.V. testified she was pregnant again in December 2013. She told Lee. She testified that in February 2014, "Tony went and got medication and he had told me—forced me to take medication to take out the child again. And I said, no, I'm not going to take it and then he had a knife . . ."

> Q. Do you know where he had the medication at? A. The medication, he told me he went back to Minnesota to purchase it.
> Q. Did they look like—What did the pills look like? A. Very tiny. I believe it looks like the first ones that I took. I've never seen it before.
> Q. And do you remember how many pills you took this time? A. This time Tony forced me to take the medication three times.
> Q. Do you remember how many pills on that first occasion? A. The very first time he gave me one first.
> Q. Do you remember when that was—what date it was? A. It was February of 2014.
> . . . .
> A. It was in the evening, but that was after Tony got off work so I don't know what time it was.
> Q. What time does he get off work? A. 1:30.

Q. In the afternoon or morning?  A. At night.

Q. So 1:30 a.m.?  A. After he got off work at 1:30.

Q. So can you tell us what happened when he came to you with the pills?  A. He said to take it or he was going to kill me and he had a knife with him also.

. . . .

A. This is the knife [exhibit 2] that he used to force me to take the medications.  If I didn't, he was going to kill me.

. . . .

A. And then he said, you—he said I better eat it.  If I don't take it, he says, he's going to kill me because he bought life insurance for me.  He had a policy for a hundred thousand dollars.  He can kill me and then use that money to go buy—to go and purchase another girl from Laos to come live with him, and then I was so scared that I thought I was even going to die today or tomorrow, so I just felt I should take the medication.

Q. And did you take those medications?  A. Yes, I did because he forced me to take it so I did.  So I had choice of dying today right away or dying the next day so I took the medication so I could live the next day.

Q. Can you tell us what happened after you took the pills on that occasion?  A. After I took it, I felt like I had some stomach pain.  I felt like I wasn't able to breathe and then blood starting coming out.

M.V. testified a second incident happened during the same pregnancy much like the first incident:

Q. [M.V.], was this the only time that you took the pills during the second pregnancy?  A. The first time the child didn't come out.  He forced me a second and third time.

Q. I want to talk about the second time.  Can you tell us what happened the second time?  A. Because I was already bleeding after the second time and I loved my child and I kept saying, no, I don't want to take it.  I kept bleeding but I didn't miscarry it.  And then he had me take medication again the second time.

Q. And during that second time you took it, did he force you?  A. Yes, he forced me the same way.

Q. What do you mean by the same way?  A. And he had done the same thing with the knife.  He said I should take it so the child is miscarried.  He does not want a child.

Q. I want to ask, is the knife you're talking about this time, is that the same knife as used before?  A. Yes.  He did the same thing, same style.

Q. Do you remember when the second time was?  A. Well, I remember he gave me medications between February to April, but I

have a lot of stress so I can't remember. I took the medication for two months when the child was almost four months and the child still didn't miscarry.

Q. So you mentioned there was a third time? A. Yes. The third time also I kept bleeding but the child didn't miscarry so he kept giving me medication so the child would come out.

M.V. also testified that during this second pregnancy, Lee forced her to have sex with him despite her saying she did not want to, she was still bleeding, and she "might die." She testified further,

Q. . . . [D]o you remember the last time that occurred? A. The last time? I had a lot of stress so I don't remember. The last time he forced me to have sex I almost died.

Q. What happened after that last time he forced you? A. He forced me to have sex again and then the last time I almost died so he took me to the hospital.

Q. Why did he take you to the hospital? A. I almost died. My stomach was hurting. I was bleeding.

Q. Did you know when you got to the hospital, what was happening? A. Because he was—It was pretty scary. I almost died. That's why he took me to the hospital. Before he took me to the hospital, and then he had put a knife up to me, he said to me, we're going to the hospital. We're going to save my life only. We're not going to save the child's life and not only that, not to tell the doctors that he gave me the medication and do not tell the police or else he will kill me.

Q. So what hospital did you go to? A. At that time, I was in a lot of pain so we went straight to the emergency at the major hospital.

Q. Did you tell the doctors at the hospital why it happened? A. He told me not to tell I took the medicine. Tony did not let me say anything so when we went there I just said I was bleeding and I was pregnant.

Q. Was Tony with you at this time? A. Uh-huh, Tony went with me. And then after they took me—they examined me and said they weren't able to help my child anymore because my cervix had already opened, maybe an hour from now maybe my child will come out and they will not be able to help me. I was really hurt and I was crying. I felt sorry.

. . . .

A. But the doctor advised, he said there's a way he could help me save my child, and then I told the doctor I can't make that decision because I told Tony to come back first.

Q. Did Tony came back? A. Yes, then Tony came back.

Q. And can you tell us what he told you? A. So when he came back, the doctors were not there anymore and Tony said to me if we're going to save the child's life in Omaha, don't do that. Because that child had—because the child had so much medication already that even if the child survived, it might be like maybe Downs Syndrome child or might have a lot of birth defects. Tony said if I went to Omaha to go save the child's life, then he was going to kill me. And then Tony said to tell the doctor that—to give us a few days to think about it, we'll come home, give medication, Hmong herbs, to help me out and if it does not help, then we will go back to the hospital. If I didn't—If I did not do what Tony said, then he was going to kill me. I was very scared from what he said to me.

M.V. testified that when she and Lee returned to their home, Lee told her he was going to get stronger medication "so the child could just come out," at which point she was concerned she "could end up dying" and decided she "needed to leave the home because I cannot take his torture anymore." She testified she did not know exactly when she miscarried, but after leaving Lee's home, she "just saw a lot of blood, clots, a lot of blood."

M.V. testified Lee had been communicating with another woman in Laos in December 2013 to January 2014 and that Lee intended to go visit that woman. M.V. told him he could not go. On cross-examination, M.V. confirmed this was the remainder of her answer made in a prior deposition:

He—He was going to go. He was going to go, but then at that time, the moment he was going to leave, he found out that I was pregnant so he decided to change his plan and wanted me to have a miscarriage before he goes because he wouldn't—excuse me—before he goes because then he wouldn't have to pay child support.

M.V. also testified about the no-contact order issued in 2012 and the domestic-abuse-assault case that was filed against Lee. She stated she had called police because Lee had beaten her and

the police took Tony to jail. After that, the day before—After that, the day before coming to court and Tony had controlled me and he

told me that I better not show up to court, I cannot show my face in court. If Tony gets in trouble, he gets charged, then he was going to kill me, and he was going to hire people to kill my mom and dad. And that's why I did not come to court and before Tony was going on his way to court—Before Tony was suppose[d] to come to court, he gave me paper to sign, but I don't know what the paper said or what the paper means. And then Tony came back, he said that was the paper that stated I wrote it myself, and then the paper said that Tony did not hit me and everything that happened that night was not true.

. . . .

Q. I hand you a document marked State's Exhibit 11. What is that? A. I don't—I don't read at all.

Q. Do you remember signing that document? A. Yes, I do remember. This is my signature.

Q. I think you said earlier that you don't read or write or speak any English; is that right? A. No, I don't know to speak or write English at all.

Q. In that letter it mentions a Vamntxawg Lee. Do you know someone by that name? A. I don't know that person, never seen that person.

Q. Who asked you or who told you to sign that letter? A. Tony Lee gave it to me to sign.

Q. [M.V.], do you know what happened to that charge for assault that Tony was charged with? A. After that, I don't know anything about the case. I don't know how to read and write English. I don't have any knowledge.

Over the defense's standing objection, O.L. testified she was pregnant in 2008. When she told Lee, he said he would not allow her to have the child. O.L. wanted to have the baby but Lee "said he didn't want [her] to have [the baby] so he gave [her] some pills to take." O.L. did not know what the pills were. However, after she took the pills, she "started to have spotting" and did not carry her pregnancy to term. In 2009, O.L. was pregnant again. She told Lee. O.L. was having headaches and Lee gave her pills that he claimed were for headaches—but they looked "just like" the pills that made her miscarry the year before. She took a total of three pills on two consecutive days. She did not carry the baby to term. O.L. was pregnant again in 2011. Again, Lee told her she was

not allowed to have a baby, and he told her she would have to take the pills again. O.L. testified she moved out during this pregnancy before she took any pills and she delivered the child later.

At the end of the State's case in chief, defense counsel moved generally for judgment of acquittal, claiming there was not "sufficient evidence in support of the charges to proceed further." The State responded:

> With regards to Count [3, 4, 5, and 6], there's credible testimony that the Defendant forced, by either physical force or intimidation, [M.V.] to ingest substances that led to miscarriage. The testimony of [M.V.] and [O.L.] demonstrates that this was not an accident, is not a coincidence, that the Defendant did have substances or access to substances that would result in miscarriage.
> With regards to Count [8 and 9], there is credible testimony that on both cases charged, the Defendant used a weapon in the commission of the forced consent to the termination of pregnancy. Under the assault chapter, assault—the use of a weapon is a—is an—is an assault under the code and, therefore, while participating in the felony of forced consent to termination of pregnancy would be guilty as such so far as under the idea of assault while participating in a felony.

Defense counsel then stated, "I need to be a little bit more specific in my motion for judgment of acquittal." Counsel asserted there was not credible evidence to support the charges: counts 1 and 2 being "based solely upon the unsubstantiated and uncorroborated statements of the alleged victim here"; counts 3, 4, 5, and 6 "are also unsubstantiated, uncorroborated," and O.L.'s testimony was too remote in time and not relevant; and counts 8, 9, and 10 were all unsubstantiated, uncorroborated, and based on M.V.'s non-credible testimony. The motion was denied.

Lee testified in his own defense, denied any involvement with the letter that asked the court to drop the no-contact order, and denied knowing a

Vamntxawg Lee. He also denied the knife M.V. turned in to police was his, denied threatening M.V. in any way or forcing M.V. to have sex, and denied giving M.V. any medication other than pain medication for headaches. Lee admitted he placed a substance in M.V.'s gas tank, stating he did it because he had seen her being carried by her boyfriend and he "felt like my heart was torn apart so I did it to the car that I bought for her." He stated M.V. left him on April 25 and would not answer his calls for days. When next he heard from M.V., she told him she had miscarried and she had buried the child in a yard.

Lee testified he contacted immigration authorities after M.V. left: "Because I had sponsor[ed] her from a different country and I wanted to let them know what was going on because I no longer wanted to be responsible for her. Because she was living with another person, I wanted to let immigration know that." He also testified that when he was questioned about vandalizing the car, he asked the police officer to help him contact immigration "and have her go back to Laos."

On cross-examination, Lee again stated he did not know Vamntxawg Lee, who was identified in the 2012 letter as M.V.'s nephew. He acknowledged M.V. had no family in the United States when she arrived here.

The trial court denied Lee's renewed motion for judgment of acquittal and renewed objection to O.L.'s testimony.

For each count asserting a violation of Iowa Code section 707.8, the district court provided a preliminary draft jury instruction identical to the following, with the pertinent dates of the offense substituted:

> **Forced Consent to Termination of Human Pregnancy—Count 3**
> The State must prove the following elements of the crime of Forced Consent to Termination of Human Pregnancy:

1. From on about September 2012 to October 2012 [for count 4, "On or about February 14, 2014"; for count 5, "On or about March 2014"; for count 6, "From on or about March 2014 to April 2014"], the defendant procured [M.V.'s] consent to terminate [M.V.'s] pregnancy.

2. The Defendant procured [M.V.'s] consent by force or intimidation.

Concerning the counts of assault while participating in a felony, the court proposed the following jury instruction:

**Assault While Participating In A Felony—Count 8**
The State must prove the following elements of the crime of Assault While Participating in a Felony:

1. On or about February 14, 2014, [or, for count 9, March 2014] the Defendant committed the crime of Forced Consent to Termination of Human Pregnancy as defined [above].

2. During the commission of Element No. 1, the Defendant committed an assault as defined in Instruction No. 36 against [M.V.]

If the State has proved all of the elements, the defendant is guilty of Assault While Participating in a Felony. If the State has failed to prove any one of the elements, the defendant is not guilty of Assault While Participating in a Felony and you will then consider the charge of Assault as explained in Instruction No. 30

Defense counsel made no objections to the court's proposed jury instructions and the preliminary drafts became the final instructions submitted to the jury.

The following chart summarizes the jury's finding on each of the charges brought against Lee:

| Count 1 | Sexual abuse, using dangerous weapon | Not guilty |
|---------|--------------------------------------|------------|
| Count 2 | Sexual abuse, using dangerous weapon | Guilty of assault |
| Count 3 | Forcibly procuring consent to termination of pregnancy (2012) | Not guilty |
| Count 4 | Forcibly procuring consent to termination of pregnancy (Feb. 14, 2014) | Guilty |
| Count 5 | Forcibly procuring consent to termination of pregnancy (Mar. 2014) | Guilty |
| Count 6 | Forcibly procuring consent to termination of pregnancy (Mar. to Apr. 4/14) | Not guilty |

| Count 8 | Assault while participating in February 2014 felony | Guilty |
| Count 9 | Assault while participating in March 2014 felony | Guilty of assault |
| Count 10 | Tampering with witness on 5/17/12 | Guilty |

Lee filed a motion for new trial claiming newly-discovered evidence, i.e., that Lee misunderstood the question during trial concerning Vamntxawg Lee. Lee stated he knows Vamntxawg Lee as Wager Lee, who is his nephew. Defense counsel had contacted Vamntxawg Lee after trial, who submitted an affidavit on October 7, 2015, in which he averred: Lee did not know his Hmong name but knew him as Wager Lee; on May 17, 2012, M.V. had come to him and asked him to help her; as a result, Vamntxawg Lee "sat down at [his] computer and typed the letter"; M.V. signed the letter in his presence and took the letter with her when she left; and "I identified myself in the letter as the nephew of [M.V.] I am the blood nephew of Tony Lee. However, in the Hmong culture, I am also considered the nephew of Tony Lee's wife."

The district court found the purported newly-discovered evidence probably would not have changed the result of the trial and denied the motion. The court then sentenced Lee to terms of incarceration as follows: on count 2, thirty days; on count 4, ten years; on count 5, ten years; on count 8, five years; on count 9, thirty days; and on count 10, two years. The sentences on counts 2, 4, 5, 9, and 10 were to be served concurrently, but consecutive to the sentence on count 8. Fines and surcharges were suspended.

On appeal, Lee argues he was denied the effective assistance of trial counsel because counsel failed to challenge the sufficiency of the evidence of actual termination of a pregnancy, failed to require the jury instructions to include

actual termination of pregnancy as an element of the offense of forcibly procuring consent to termination of pregnancy, and failed to challenge the trial information as impermissibly multiplicitous. Lee also asserts the trial court erred in denying his motion for judgment of acquittal on the counts of forcibly procuring consent to termination of pregnancy, erred in allowing prior-bad-acts testimony by Lee's former wife, and erred in denying his motion for new trial. In addition, Lee contends the court erred in denying his request to continue the trial to secure two certified interpreters. Finally, Lee maintains the court imposed an illegal sentence by not combining the two convictions for forcibly procuring consent to termination of pregnancy and by taxing costs associated with dismissed charges.

## II. Scope and Standard of Review.

Because ineffectiveness claims arise from the Sixth Amendment right to counsel, "[w]e review claims of ineffective assistance of counsel de novo." *State v. Truesdell*, 679 N.W.2d 611, 615 (Iowa 2004) (citation omitted).

"We review a district court's evidentiary rulings regarding the admission of prior bad acts for abuse of discretion." *State v. Cox*, 781 N.W.2d 757, 760 (Iowa 2010). "However, to the extent a challenge to a trial court ruling on the admissibility of evidence implicates the interpretation of a statute or a rule of evidence, our review is for errors at law." *Id.*

Rulings on motions to continue will not be set aside unless there has been an abuse of the trial court's discretion. *State v. Marti*, 290 N.W.2d 570, 588 (Iowa 1980). "An abuse of discretion occurs when the trial court exercises its discretion 'on grounds or for reasons clearly untenable or to an extent clearly unreasonable.'" *Cox*, 781 N.W.2d at 760 (citation omitted).

**III. Discussion.**

    **A. Ineffective assistance of counsel.** Generally, ineffective-assistance of counsel claims are preserved for possible postconviction-relief actions. Iowa Code § 814.7. However, if we find the record adequate to decide the claim, we may address it on direct appeal. *State v. Fountain*, 786 N.W.2d 260, 263 (Iowa 2010). A defendant must prove both that counsel failed in an essential duty and prejudice resulted. *State v. Graves*, 668 N.W.2d 860, 869 (Iowa 2003).

    Our analysis here mirrors that in *Fountain*, 786 N.W.2d at 263. Lee's erroneous-instruction claim is raised in the context of an ineffective-assistance-of-counsel claim. Counsel has no duty to raise an issue that has no merit. *State v. Wills*, 696 N.W.2d 20, 24 (Iowa 2005). "Therefore, we must first 'assess whether the record demonstrates, as a matter of law, the existence or absence of a meritorious [claim]' or error." *Fountain*, 786 N.W.2d at 263 (quoting *Graves*, 668 N.W.2d at 869). Here, that means we must decide whether it can be determined as a matter of law that Lee's counsel was ineffective in failing to object to the preliminary draft of the jury instructions and request the element that Lee's conduct resulted in actual termination of the pregnancy in the jury instructions on counts 4 and 5 (forcibly-procuring-consent-to-termination-of-pregnancy charges) and counts 8 and 9 (assault while participating in a felony).

    *1. Breach of duty.* "In Iowa all crimes are statutory." *State v. Hansen*, 55 N.W.2d 923, 923 (Iowa 1952). Because the ineffectiveness claim challenges the elements of the offense charged, the question is one of statutory interpretation.

The primary purpose of statutory interpretation is to determine legislative intent. *State v. Johnson*, 630 N.W.2d 583, 586 (Iowa 2001). We "glean[] this intent from the words used by the legislature." *Id.*

> "We do not speculate as to the probable legislative intent apart from the words used in the statute." *State v. Adams*, 554 N.W.2d 686, 689 (Iowa 1996); *accord State v. Welton*, 300 N.W.2d 157, 160 (Iowa 1981) (stating, "when a statute is plain and its meaning is clear, courts are not permitted to search for meaning beyond its expressed terms"). "Although the title of a statute cannot limit the plain meaning of the text, it can be considered in determining legislative intent." *T & K Roofing Co. v. Iowa Dep't of Educ.*, 593 N.W.2d 159, 163 (Iowa 1999). In addition, "legislative intent is to be gleaned from the statute as a whole, not from a particular part only." *De More v. Dieters*, 334 N.W.2d 734, 737 (Iowa 1983). If the language of the statute is clear and unambiguous, we apply a plain and rational meaning consistent with the subject matter of the statute. *City of Waukee v. City Dev. Bd.*, 590 N.W.2d 712, 717 (Iowa 1999).

*State v. Tague*, 676 N.W.2d 197, 201-02 (Iowa 2004).

But, in the event there is more than one plausible interpretation of a statute, our supreme court has stated,

> [W]e must look beyond the plain language of the statute to resolve the ambiguity. *See State v. Wiederien*, 709 N.W.2d 538, 541 (Iowa 2006). Our goal is to "ascertain and effectuate the true legislative intent." *State v. Carpenter*, 616 N.W.2d 540, 542 (Iowa 2000). We examine the language of the statute, its underlying purpose and policies, and the consequences stemming from different interpretations. *Id.* In doing so, we must construe the statute in its entirety. *Id.* "If more than one statute relating to the subject matter at issue is relevant to the inquiry, we consider all the statutes together in an effort to harmonize them." *Id.*
>
> In determining the intent of the legislature, we will not construe the language of a statute to produce an absurd or impractical result. *Id.* "We presume the legislature intends a reasonable result when it enacts a statute." *Id.* Additionally, "'we strictly construe criminal statutes and resolve doubts in favor of the accused." *State v. McCullah*, 787 N.W.2d 90, 94 (Iowa 2010) (citation omitted).

*State v. Adams*, 810 N.W.2d 365, 369 (Iowa 2012).

Lee was convicted of two counts of violating Iowa Code section 707.8(5), which provides: "A person who by force or intimidation procures the consent of the pregnant person to a termination of a human pregnancy is guilty of a class 'C' felony." Lee argues that "a termination of a human pregnancy" is an element of the offense. The State asserts the language of the provision unambiguously prohibits forcibly "procur[ing] the consent of a pregnant person" and does not require the actual termination of a pregnancy. We conclude Lee has the better argument.

Lee points out that prior to 1978 there was no comparable crime to the offenses now contained in section 707.8. When the Iowa criminal code was completely revised in 1978, chapter 707 (entitled "Murder") included section 707.8, entitled "Nonconsensual termination," and providing:

> 1. A person who terminates a human pregnancy without the consent of the pregnant person during the commission of a felony or felonious assault is guilty of a class "B" felony.
> 2. A person who intentionally terminates a pregnancy without the knowledge and voluntary consent of the pregnant person is guilty of a class "C" felony. This subsection shall not apply to a termination performed without the consent or knowledge of the pregnant person by a physician licensed in this state to practice medicine and surgery when circumstances preclude the pregnant person from providing her consent and the termination is performed to preserve the life or health of the pregnant person or of the fetus.
> 3. A person who by force or intimidation procures the consent of the pregnant person to a termination of a pregnancy is guilty of a class "C" felony.

The title of the section—at the very least—implies termination of a pregnancy is required. *See State v. Iowa Dist. Ct.*, 630 N.W.2d 778, 781 (Iowa 2001) ("Although the title of a statute cannot limit the plain meaning of the text, it can be considered in determining legislative intent." (citation omitted)). The 1982

uniform jury instructions relevant to this version of the statutory provision

incorporated the requirement of termination of a pregnancy.

> No. 725 NONCONSENSUAL TERMINATION—DEFINITION—WITHOUT KNOWLEDGE OR CONSENT OR BY FORCE OR INTIMIDATION
> The law provides that a person commits the offense of Nonconsensual Termination when he (intentionally causes a pregnancy to be terminated without the knowledge and voluntary consent), (by force or intimidation, procures the consent) of the pregnant person.

> No. 727 NONCONSENSUAL TERMINATION—ELEMENTS—CONSENT PROCURED BY FORCE OR INTIMIDATION
> You must find the defendant not guilty of Nonconsensual Termination, unless the State proves by evidence beyond a reasonable doubt, each of the following elements:
> 1.) That on or about the ____ day of ____, 19__, the defendant terminated the pregnancy of _____.
> 2.) That the defendant obtained the consent to the termination by force or intimidation.
> If you find the State has proved beyond a reasonable doubt each of the elements, then you must find the defendant guilty; but, if you find the State has failed to prove beyond a reasonable doubt one or both of the elements, then you shall find the defendant not guilty.

Section 707.8 was amended in 1996. 1996 Iowa Acts ch. 1077, § 2.

Section 707.8 thereafter was entitled "Nonconsensual termination—serious injury

to a human pregnancy."[5] While section 707.8(5) has been renumbered from

---

[5] This version of section 707.8 was applicable to the counts charged here and remains in effect:

> 1. A person who terminates a human pregnancy without the consent of the pregnant person during the commission of a forcible felony is guilty of a class "B" felony.
> 2. A person who terminates a human pregnancy without the consent of the pregnant person during the commission of a felony or felonious assault is guilty of a class "C" felony.
> 3. A person who intentionally terminates a human pregnancy without the knowledge and voluntary consent of the pregnant person is guilty of a class "C" felony.

section 707.8(3) it is otherwise unchanged. There is nothing in the revision that

suggests the legislature intended to change the prior law with regard to this

subparagraph. *See Eggman v. Scurr*, 311 N.W.2d 77, 80 (Iowa 1981) ("Revised

---

4. A person who unintentionally terminates a human pregnancy by any of the means provided pursuant to section 707.6A, subsection 1, is guilty of a class "C" felony.

5. A person who by force or intimidation procures the consent of the pregnant person to a termination of a human pregnancy is guilty of a class "C" felony.

6. A person who unintentionally terminates a human pregnancy while drag racing in violation of section 321.278 is guilty of a class "D" felony.

7. A person who unintentionally terminates a human pregnancy without the knowledge and voluntary consent of the pregnant person by the commission of an act in a manner likely to cause the termination of or serious injury to a human pregnancy is guilty of an aggravated misdemeanor.

8. A person commits an aggravated misdemeanor when the person intentionally causes serious injury to a human pregnancy by the commission of an act in a manner likely to cause the termination of or serious injury to a human pregnancy.

9. A person commits an aggravated misdemeanor when the person unintentionally causes serious injury to a human pregnancy by any of the means described in section 707.6A, subsection 1.

10. A person commits a serious misdemeanor when the person unintentionally causes serious injury to a human pregnancy by the commission of an act in a manner likely to cause the termination of or serious injury to the human pregnancy.

11. For the purposes of this section "serious injury to a human pregnancy" means, relative to the human pregnancy, disabling mental illness, or bodily injury which creates a substantial risk of death or which causes serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ, and includes but is not limited to skull fractures, rib fractures, and metaphyseal fractures of the long bones.

12. As used in this section, actions which cause the termination of or serious injury to a pregnancy do not apply to any of the following:

a. An act or omission of the pregnant person.

b. A termination of or a serious injury to a pregnancy which is caused by the performance of an approved medical procedure performed by a person licensed in this state to practice medicine and surgery or osteopathic medicine and surgery, irrespective of the duration of the pregnancy and with or without the voluntary consent of the pregnant person when circumstances preclude the pregnant person from providing consent.

c. An act committed in self-defense or in defense of another person or any other act committed if legally justified or excused.

criminal code offenses are to be construed as altering prior law only if a legislative intent to change the prior law is clear.").

The State's argument is that the fifth subparagraph unambiguously criminalizes only the forcible procurement of consent to terminate a pregnancy and requires no showing that the defendant's action caused some effect to the pregnancy, even though the remaining subparagraphs (1) through (4) and (6) through (10) do. We do not find this reading of the provision convincing or harmonizing.

"When considering the meaning of a criminal statute, courts may consider the evil sought to be remedied and the purposes or objectives of the enactment." *State v. Clark*, 406 N.W.2d 802, 805 (Iowa Ct. App. 1987) (citing *State v. Sullivan*, 298 N.W.2d 267, 271 (Iowa 1980)). Here, the legislature told us of its objective. In revising section 707.8, the legislature explained it was "[a]n act relating to nonconsensual termination of or serious injury to a pregnancy and providing penalties." 1996 Iowa Acts ch. 1077. We read this purpose as being aimed at prohibiting certain actions by a defendant that result in a "termination of or serious injury to a pregnancy." In this instance, the title provides additional evidence of the legislature's intent. *See Iowa Dist. Ct.*, 630 N.W.2d at 781 (stating the title of a statute can be considered in determining legislative intent). It is evident the 1996 revision was intended to broaden the scope of prohibited harms resulting from a defendant's action.

Reading the provision logically and as a whole, the first seven subparagraphs refer to various intentional acts by a defendant[6] that result in the nonconsensual termination of a pregnancy in descending seriousness of consequences (from class "B" felony to aggravated misdemeanor), while the eighth through the tenth subparagraphs refer to various intentional and unintentional acts that result in serious injury to a pregnancy, also in descending seriousness (from aggravated misdemeanor to serious misdemeanor). The eleventh subparagraph defines "serious injury to a human pregnancy," and the twelfth subparagraph sets out exceptions.

While very few criminal cases address section 707.8, the ones that do support the defense's position. For example, in *State v. Serrato*, 787 N.W.2d 462, 469 (Iowa 2010), the supreme court issued a decision in which the defendant was convicted of a violation of section 707.8(1), stating: "The offense of nonconsensual termination of a human pregnancy requires that Serrato have terminated a human pregnancy without the consent of the pregnant person while committing a forcible felony." In that case, the court observed: "The fetus was dependent upon the circulation of Carmona's body and died as a result of her death; therefore, the forcible felony required by Iowa Code section 707.8(1) would be the murder of Carmona." *Id.*

In *State v. Hippler*, 545 N.W.2d 568, 570 (Iowa 1996), the supreme court stated:

---

[6] While subsections 4, 6, and 7 reference "unintentional" termination, the acts referenced are intentional: subsection 4 references section 707.6A(1), which relates to operating a motor vehicle while intoxicated; subsection 6 refers to drag racing; and subsection 7 refers to the "commission of an act in a manner likely to cause termination or serious injury to a human pregnancy."

*A. Applicable law.* Iowa Code section 707.8(1) provides that

[a] person who terminates a human pregnancy without the consent of the pregnant person *during the commission of a felony* or felonious assault is guilty of a class "B" felony.

(Emphasis added.) In pertinent elemental terms, the nonconsensual termination of a human pregnancy occurs through (1) the termination, (2) of a human pregnancy, (3) without the consent of the pregnant person, (4) during the commission, (5) of a felony.

B. *The merits.* Section 707.8(1) definitely requires a nexus or link between the underlying felony and the termination of the pregnancy. The nexus requirement is expressed in the phrase "during the commission of a felony or felonious assault."

This court was presented with a case challenging the jury instructions used to convict a defendant with a violation of section 707.8(2) in *State v. Wilmer*, No. 06-1339, 2007 WL 4322212, at *8 (Iowa Ct. App. Dec. 12, 2007) (holding the jury instructions were faulty because they did not allow the court to determine whether the jury's guilty verdict under this section was based on a forcible or nonforcible felony).

We believe that "in pertinent elemental terms," a violation of section 707.8(5) requires (1) the termination of (2) a human pregnancy (3) by procuring the consent of the pregnant person (4) by force or intimidation. *Cf. Hippler*, 545 N.W.2d at 570. We note that in dicta, the United States District Court for the Northern District of Iowa reads the provision to require termination of a pregnancy:

Iowa Code section 707.8 makes it a crime to "terminate[] a human pregnancy without the consent of the pregnant person." At the time *Dunn* [*v. Rose Way, Inc.*, 333 N.W.2d 830 (Iowa 1983),] was decided, section 707.8 *prohibited termination of a human pregnancy without the mother's consent* during the commission of a felony or felonious assault, or *by force or intimidation. See* Iowa Code § 707.8 (1977). In 1996, section 707.8 was rewritten to broaden the statute's scope. Among other things, the statute now

includes criminal penalties for the unintentional termination of a human pregnancy by someone operating a motor vehicle while intoxicated, or while drag racing. Iowa Code § 707.8(4), (6); *see* Iowa Code § 707.6A(1); Iowa Code § 321.278.

*Estate of Storm v. Nw. Iowa Hosp. Corp.*, No. C06-4070-DEO, 2006 WL 3487620, at *4 (N.D. Iowa Dec. 4, 2006) (emphasis added), *subsequently dismissed*, 548 F.3d 686 (8th Cir. 2008).

If the offense did not require the termination of the pregnancy, there would be a clear omission in Iowa Code section 707.8 of an offense involving the use of force to procure the consent of a pregnant person to terminate a human pregnancy the elements of which *did* require proof of termination of the pregnancy. Moreover, without the termination of the pregnancy, the act of procuring the consent of a pregnant person to terminate a pregnancy by force, falls squarely within one of the various offenses defined in Iowa Code chapter 708, pertaining to assault. Clearly, section 707.8 is intended to criminalize acts that cause a nonconsensual termination of a pregnancy or serious injury to a human pregnancy. It is absurd to conclude the legislature chose to increase the penalty for an assault,[7] to a class "C" felony where the assault only procures the

---

[7] Iowa Code section 708.2 provides:

1. A person who commits an assault, as defined in section 708.1, with the intent to inflict a serious injury upon another, is guilty of an aggravated misdemeanor.

2. A person who commits an assault, as defined in section 708.1, and who causes bodily injury or mental illness, is guilty of a serious misdemeanor.

3. A person who commits an assault, as defined in section 708.1, and uses or displays a dangerous weapon in connection with the assault, is guilty of an aggravated misdemeanor. This subsection does not apply if section 708.6 or 708.8 applies.

4. A person who commits an assault, as defined in section 708.1, without the intent to inflict serious injury, but who causes serious injury, is guilty of a class "D" felony.

pregnant person's consent to terminate a pregnancy without any proof necessary that the act affected the safety of the fetus or pregnant person. According to the State, it is the pregnant person's mind or opinion that is protected by the statute. We find this suggested intent of the statute incredulous considering this statute falls within Iowa Code chapter 707, entitled "Homicide and Related Crimes," and because, as we have noted, all other sections of Iowa Code section 707.8 serve to protect the safety of the human pregnancy.

Here, the jury instructions given on counts 4, 5, and 6 did not require the jury to determine whether Lee's conduct resulted in the termination of M.V.'s pregnancy. The State, in fact, argued that the various counts were brought because the pills M.V. was forced to take did not end her 2014 pregnancy in February and March. M.V. was four-months pregnant in April when she was taken to the ER. Lee is correct that the district court erred in failing to instruct the jury that a termination of pregnancy was required, and defense counsel should have requested such an instruction. *See Fountain*, 786 N.W.2d at 266 ("In [*State v.*] *Schoelerman*, [315 N.W.2d 67, 71-72 (Iowa 1982)], this court declared that '[a] normally competent attorney . . . should either be familiar with the basic provisions of the criminal code, or should make an effort to acquaint himself with those provisions which may be applicable to the criminal acts allegedly committed by his client.'"). Especially in light of multiple charges arising from

---

5. A person who commits an assault, as defined in section 708.1, and who uses any object to penetrate the genitalia or anus of another person, is guilty of a class "C" felony.
6. Any other assault, except as otherwise provided, is a simple misdemeanor.

M.V.'s 2014 pregnancy (counts 4, 5, 6, 8, and 9), we can think of no strategic reason that defense counsel did not request such an instruction.

2. *Prejudice.* "[I]neffective-assistance-of-counsel claims based on failure to preserve error are not to be reviewed on the basis of whether the claimed error would have required reversal if it had been preserved at trial." *State v. Maxwell*, 743 N.W.2d 185, 196 (Iowa 2008). Instead, Lee must show a breach of an essential duty and prejudice. *See id.* "In ineffective-assistance-of-counsel claims 'the instruction complained of [must be] of such a nature that the resulting conviction violate[s] due process.'" *Id.* (quoting *State v. Hill*, 449 N.W.2d 626, 629 (Iowa 1989)). Consequently, we must determine whether Lee was prejudiced by his counsel's failure to request the jury instructions include the element of termination of pregnancy. In determining whether the prejudice prong has been met, "we must consider the totality of the evidence, what factual findings would have been affected by counsel's errors, and whether the effect was pervasive or isolated and trivial." *State v. Clay*, 824 N.W.2d 488, 496 (Iowa 2012).

When reviewing the jury instructions that were actually given by a district court, "we are trying to determine whether the instructions actually given by the district court accurately portray the applicable law to the jury." *State v. Becker*, 818 N.W.2d 135, 144 (Iowa 2012). "A jury instruction that omits an element of a criminal offense is erroneous and not a correct statement of the law." *State v. Hoyman*, 863 N.W.2d 1, 15 (Iowa 2015); *see State v. Pearson*, 804 N.W.2d 260, 265 n.1 (Iowa 2011) (holding the omission of one element of the offense from a jury instruction necessitated a new trial); *State v. Schuler*, 774 N.W.2d 294, 298-

99 (Iowa 2009) (finding an instruction that allowed the jury to convict the defendant without finding all elements of the offense was erroneous and ordering a new trial); *see also State v. Milder*, No. 14-0076, 2015 WL 3613338, at *9-12 (Iowa Ct. App. June 10, 2015) (finding trial counsel breached a duty in failing to object to jury instructions that omitted elements of conspiracy to manufacture, determining prejudice resulted, and ordering a new trial).

In a case in which trial counsel fails to object to an erroneous instruction, certain factors may militate against a finding of prejudice. *State v. Miles*, 344 N.W.2d 231, 235 (Iowa 1984). First, prejudice may not exist if a separate instruction correctly informs the jury of the element omitted from the marshalling instruction. *Id.* In this case no separate instructions correctly stated that the State was required to prove the termination of M.V.'s 2014 pregnancy resulted from Lee's procurement of consent by force or intimidation.

Second, prejudice may not exist if the element in question is not a fighting issue in the case. *Id.* That is not the case here as Lee contended he did not give any medications to M.V. and made a statement to police that M.V. had terminated her own pregnancy.

Third, prejudice may not exist where the evidence of guilt is so strong there is no reasonable probability the result would have been different if the instruction in question had been correctly stated. *State v. Hopkins*, 576 N.W.2d 374, 380 (Iowa 1998). Here, the jury deliberated for several hours over the course of two days. The jury asked to review deposition testimony while deliberating the first day, which request was denied, and asked to review the transcript of M.V.'s testimony the second day. The jury then returned seemingly

perplexing verdicts. The jury found Lee guilty on counts 4 and 5—procuring consent to termination of a pregnancy by force or intimidation on February 14, and in March 2014. But the jury found Lee not guilty of count 6—procuring consent to termination of a pregnancy by force or intimidation "on or about March to April 2014." M.V. was still pregnant in late April 2014. Moreover, the jury also considered two counts of assault while participating in a felony, both underlying felonies being the forced procurement of consent to the one 2014 termination of a pregnancy. And the jury found Lee guilty of count 8, assault while participating in a felony, the felony being count 4; but guilty only of assault as the lesser-included offense of count 9, which charged assault while committing the felony Lee was found guilty of on count 5, the March 2014 procurement of consent to termination of pregnancy by force or intimidation.[8]

Moreover, the omission of the element that the pregnancy be terminated affected five counts—three counts of forcibly procuring consent to terminate pregnancy and two counts of assault while participating in a felony. Although we acknowledge the jury rejected Lee's claim that he did nothing toward M.V., the jury never addressed the issue of whether Lee's efforts effectuated a termination of the pregnancy, if M.V. ultimately miscarried unrelated to Lee's acts, or if M.V. subsequently voluntarily chose to terminate the pregnancy. Without such factual findings, we conclude the effect of counsel's error was pervasive, not isolated or trivial. *See Clay*, 824 N.W.2d 496. And we are unable to conclude the jury would have convicted Lee if counsel had objected to the instruction and the

---

[8] We note also that the State's closing argument misstates the charges on count 8 and 9 were "tied to" counts 3 and 4 (which concern two separate pregnancies). But count 8 and 9 are, in fact, tied to counts 4 and 5 (both concerning the same pregnancy).

omitted element had been added to the marshalling instructions to counts 4, 5, and 6. *See State v. Thorndike*, 860 N.W.2d 316, 322 (Iowa 2015) (finding no prejudice if the jury would have still reached the same result with the proper jury instruction). Thus, we conclude Lee was prejudiced by counsel's failure to object to the instructional errors. We therefore reverse Lee's convictions on counts 4, 5, and 8.

**B. Discretionary review of assault convictions.** There is no right to appeal from simple misdemeanors, though we may grant discretionary review. *See* Iowa Code § 814.6(1)(a), (2)(d). Lee asks that we grant discretionary review to the extent he is challenging the two assault convictions, which were entered as lesser-included offenses of filed charges. We grant discretionary review of the simple misdemeanor assaults pursuant to Iowa Rule of Appellate Procedure 6.108. However, we deny the relief sought. Lee does not make any argument why count 2 should be reversed, and we are unconvinced by the tangential arguments concerning count 9. We therefore affirm the assault convictions on those two counts.

**C. Sufficiency of the evidence.** Trial counsel failed to preserve error by the very general statement in support of Lee's motion for acquittal, "I would simply say that I don't believe the State has presented sufficient evidence in support of the charges to proceed further to make their case to proceed to the jury." *See State v. Brubaker*, 805 N.W.2d 164, 170 (Iowa 2011) (stating "[t]o preserve error on a claim of insufficient evidence," the motion for judgment of acquittal must identify "the specific grounds"). However, Lee argues on appeal that if error was not preserved we consider his contention his trial counsel was

ineffective for failing to properly challenge and preserve this issue and the motion should have been granted if properly raised. *See State v. Schories*, 827 N.W.2d 659, 664-65 (2013) (stating prejudice results when the motion would have been granted if properly raised). We agree.

If properly raised, a motion of acquittal should have been granted with respect to counts 4 and 5 (forced consent to termination) and counts 8 and 9 to the extent of the greater offense of assault while participating in a felony. However, there was substantial evidence of the lesser-included offense of assault for both counts 8 and 9. In regard to both instances, M.V. was threatened with a knife near her person. Concerning count 8, although the jury did not reach a verdict on the offense of assault, it did find the State established all of the elements of the greater offense and, thus, necessarily found the State had established all of the elements of assault. And with respect to count 9, the jury found Lee guilty of the lesser offense of assault. Accordingly, we remand for entry of an amended judgment of conviction to count 8 to the lesser offense of assault and for resentencing. *See State v. Morris*, 677 N.W.2d 787, 788-89 (Iowa 2004).

**D. Prior bad acts.** Iowa Rule of Evidence 5.404(b) provides that evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity with the prior criminal acts. The prior criminal acts may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. Iowa R. Evid. 5.404(b).

Lee contends the district court abused its discretion in allowing O.L.'s testimony under Iowa Rule of Evidence 5.404(b). We conclude any error in admitting this testimony was not prejudicial in relation to the remaining convictions of assault and tampering with a witness. Accordingly, we find it unnecessary to address the issue.

**E. Motions.**

*1. Motion for continuance (Interpreter issue).* We have also thoroughly reviewed the arguments and record concerning the trial court's denial of Lee's motion to continue the trial. We find no abuse of the court's "very broad discretion." *See State v. Melk*, 543 N.W.2d 297, 300 (Iowa Ct. App. 1995) (noting we will reverse on appeal only where we find the trial court abused its discretion and injustice resulted).

"Every person who cannot speak or understand the English language and who is a party to any legal proceeding or a witness therein, shall be entitled to an interpreter to assist such person throughout the proceeding." Iowa Code § 622A.2. Iowa Court Rule 47.2(2)(a) allows non-certified interpreters to be used. However,

> [b]efore waiving minimum qualifications, the court should reschedule a court proceeding if it is likely that the additional time will allow court personnel to obtain the services of an interpreter who meets at least the minimum qualifications and the delay will not result in a failure to meet a statutory or constitutional deadline for conducting the court proceeding.

Iowa Ct. R. 47.2(2)(b).

The district court had reason to conclude that additional time would not allow court personnel to obtain the services of two certified interpreters.[9]  At the hearing on the motion to continue, the certified interpreter informed the court:

> [T]he[re] are only five certified Hmong interpreters in the nation and one of them is my—my successor who took over my job as full-time interpreter.  He cannot go out and interpret.  The other three certified Hmong interpreters have trials in Minnesota so I am the only certified interpreter that is available for . . . this trial, and supreme court rule says that you have to have certified—tried to make diligent effort to find a certified interpreter.  If no one is available, then you can go onto the next qualification which is roster interpreter, and [an available interpreter] Kabo [Yang] has worked with me for 19 years in various criminal sex trial, various murder trials and I trained her myself as a trainer for the supreme court so she is very qualified, and if there's any questions, I'm certified so if I have to do the testimony and she does—she's at the counsel table, we work very well together and there's no other certified interpreter that is available to be here today.

*2. Motion for new trial.*  "In passing on motions for a new trial based upon evidence newly discovered, the trial court is vested with wide discretion." *State v. Compiano*, 154 N.W.2d 845, 848 (Iowa 1967).  "The trial court is generally in a better position than we to determine whether evidence, newly discovered, would probably lead to a different verdict upon retrial, and we have often said we will not interfere with its ruling unless it is reasonably clear that such discretion was abused." *Id.* at 849.  There is little support for Lee's claim that he could not have discovered the evidence (that Vamntxawy Lee was Wager Lee, Lee's nephew) earlier in the exercise of due diligence.  *See State v. Allen*, 348 N.W.2d 243, 246 (Iowa 1984) (noting four requirements to succeed on newly discovered evidence

---

[9] Effective July 1, 2015, if an interpreted hearing is expected to last more than four hours, "the court must appoint more than one interpreter to serve as a team or as relay interpreters."  Iowa Ct. R. 47.3(12)(b).  Here, one Class A interpreter (certified) and one Class B interpreter (noncertified but on the roster) was used.  *See* Iowa Ct. R. 47.4(1), (2).

claim). And we find no abuse of discretion in the trial court's ruling that the purported newly discovered evidence would not have led to a different verdict on Count X, tampering with a witness. The jury was presented with evidence from M.V. that while she signed the May 2012 letter, she did not read or write English, did not know what was stated therein, and that Lee compelled her to sign the letter and threatened her if she attended the court hearing. But Lee denied writing the letter, denied threatening M.V., and denied even seeing her (which would have been a violation of the no-contact order in effect). It was for the jury to determine the credibility of the competing claims, and additional evidence from the defendant's "blood relative" seems to have inherent credibility problems. *See State v. Robinson*, 288 N.W.2d 337, 341 (Iowa 1980) ("We may infer that the jury found the testimony given by the State's witnesses to be more credible than that given by the witnesses for the defense; determination of the credibility of the witnesses and the weight of the evidence is the function of the factfinder.").

After reviewing all the evidence in the light most favorable to the prosecution, we conclude the record contains substantial evidence to support the guilty verdict on the charge of tampering with a witness. We affirm the conviction for tampering with a witness, count 10.

**F. Costs assessed on dismissed charges.** Lee also charges that the assessment of costs associated with charges for which he was not convicted constitutes a statutorily unauthorized, illegal sentence. The State concedes a defendant cannot be required to pay costs for charges on which he was acquitted. *See State v. Petrie*, 478 N.W.2d 620, 622 (Iowa 1991). Because we have vacated some of Lee's convictions and we are remanding count 8 back for

an amended judgment of conviction and resentencing, we remand for resentencing on all of Lee's convictions. Accordingly, we need not further address if any current sentences are illegal.

**IV. Conclusion.**

Because section 707.8(5) requires a resulting termination of a pregnancy, and there is no evidence the 2014 pregnancy was terminated before April 25, 2014, the convictions for procuring consent to termination of pregnancy by force or intimidation and assault while participating in a felony entered on counts 4, 5, and 8 must be reversed. We affirm the convictions for tampering with a witness (count 10) and two counts of assault (counts 2 and 9). We remand for a corrected judgment, including a conviction of assault for count 8, and re-sentencing on all remaining convictions in accordance with this opinion. Costs on dismissed charges shall not be charged to the defendant.

**REVERSED IN PART, AFFIRMED IN PART, AND REMANDED WITH DIRECTIONS.**

Vaitheswaran, Judge, concurs; Vogel, Judge, concurs specially.

**Vogel, Judge.** (specially concurring).

I agree with the majority that the legislature likely intended Iowa Code section 707.8(5) (2013) to require the termination of a pregnancy. However, I write separately to express my concern that the plain language of the statute may support a different conclusion.

The majority correctly notes: "The fundamental question presented by this appeal is whether the offense defined in section 707.8(5) requires the actual termination of a pregnancy." "To ascertain legislative intent, we look to what the legislature said." *State v. Adams*, 554 N.W.2d 686, 689 (Iowa 1996). "We do not speculate as to the probable legislative intent apart from the words used in the statute." *Id.*

The statute reads: "A person who by force or intimidation procures the consent of the pregnant person to a termination of a human pregnancy is guilty of a class 'C' felony." Iowa Code § 707.8(5). When viewed in the context of the question on appeal, the language is fairly plain and unambiguous. Simply put, there is no specific requirement that the prohibited act—"procures the consent of"—actually results in the termination of the pregnancy. If so, the legislature could well have included a critical phrase: "A person who by force or intimidation procures the consent of the pregnant person to a termination of a human pregnancy, *resulting in such termination*, is guilty of a class 'C' felony." Therefore without this clarifying phrase, the plain language only prohibits a person from procuring consent to terminate by force or coercion.

The ambiguity regarding section 707.8(5) only arises when the surrounding paragraphs and legislative history are taken into account. As the

majority points out, the subsections surrounding section 707.8(5) contain an explicit requirement that a termination result. *See* Iowa Code § 707.8(1) ("A person who terminates a human pregnancy . . . ."), (2) ("A person who terminates a human pregnancy . . . ."), (3) ("A person who intentionally terminates a human pregnancy . . . ."), (4) ("A person who unintentionally terminates a human pregnancy . . . ."), (6) ("A person who unintentionally terminates a human pregnancy . . . ."), (7) ("A person who unintentionally terminates a human pregnancy . . . ."). This raises a question as to why section 707.8(5) is different, with its focus not on the termination of the pregnancy but on unlawfully procuring the consent of a woman to terminate her pregnancy. The absence of an explicit requirement that the termination of the pregnancy result could also support the conclusion the legislature did not intend for such a requirement to exist as to subsection (5). The evil the legislature could have intended to be criminalized is "a person who by force or intimidation procures the consent." *See Adams*, 554 N.W.2d at 689 ("The wording of the statute, however, is important for what is not stated as well as for what is stated. In this regard, we follow the rule that legislative intent is also expressed by the legislature's failure to address an issue."). This point is particularly powerful when the legislature appears to have been aware of the significance of utilizing language that leaves no doubt that the defendant's action *results* in a termination of a pregnancy in other subsections of section 707.8. *See* Iowa Code § 707.8(1)–(4), (6)–(7).

The State asserts that, had the actions here—forcing the woman at knife-point to take pills—actually resulted in the termination of the pregnancy, those actions would have been covered by another subsection. *See* Iowa Code

§ 707.8(3) ("A person who intentionally terminates a human pregnancy without the knowledge and voluntary consent of the pregnant person is guilty of a class 'C' felony."). But I agree with the majority that it would be unusual for the legislature to single out the particular harm of using force or intimidation to procure the consent to terminate a pregnancy regardless of whether a termination actually resulted and not also single out the incidences where termination did result from such actions. By either reading, the statute seems to contain an omission.

Yet, I believe it is possible section 707.8(5) is unique because the legislature chose to make it so. The legislature could have targeted the distinct harm of using force or intimidation to compel a pregnant person to agree to terminate a pregnancy and made the legitimate policy judgment that such conduct was particularly reprehensible and deserving of a more serious penalty than assault under chapter 708. As the majority notes, "section 707.8 serve[s] to protect the safety of the human pregnancy." Surely, discouraging a person from using force or intimidation to compel a pregnant person to agree to termination "serve[s] to protect the safety of the human pregnancy," even if the attempt to terminate the pregnancy ultimately fails.

Ultimately, I am persuaded by the majority's comprehensive analysis of the statute, including the language, legislative history, and relevant case law. Therefore, despite my concern the plain language of the statute may leave open the possibility of criminalizing the conduct at issue in this appeal, I specially concur.