# **RECORD IMPOUNDED**

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-2093-12T2

NEW JERSEY DIVISION OF
YOUTH AND FAMILY SERVICES,[1]

      Plaintiff-Respondent,

v.

N.D.,

      Defendant-Appellant,

and

J.P. and A.J.,

      Defendants.

—————————————————————————————————————

IN THE MATTER OF E.D.,

      Minor.

—————————————————————————————————————

+---------------------------+
| **APPROVED FOR PUBLICATION** |
|                           |
| **May 8, 2014**           |
|                           |
| **APPELLATE DIVISION**    |
+---------------------------+

      Submitted March 24, 2014 – Decided May 8, 2014

      Before Judges Parrillo, Harris, and
      Guadagno.

---

[1] The complaint was filed by the Division of Youth and Family Services, which was renamed the Division of Child Protection and Permanency in June 2012.  L. 2012, c. 16, eff. June 29, 2012. For ease of reference, we will refer to the agency as the Division throughout this opinion.

On appeal from the Superior Court of New
Jersey, Chancery Division, Family Part,
Hudson County, Docket No. FN-09-218-12.

Joseph E. Krakora, Public Defender, attorney
for appellant (Clara S. Licata, Designated
Counsel, on the brief).

John J. Hoffman, Acting Attorney General,
attorney for respondent (Andrea M.
Silkowitz, Assistant Attorney General, of
counsel; Kenneth Cabot, Deputy Attorney
General, on the brief).

Joseph E. Krakora, Public Defender, Law
Guardian, attorney for minor E.D. (Karen E.
Lodeserto, Designated Counsel, on the
brief).

The opinion of the court was delivered by

GUADAGNO, J.A.D.

In this appeal, we revisit the issue of in utero exposure of a newborn to drugs and the quantum of proof necessary to sustain a finding of abuse or neglect against the mother who ingested drugs before the child was born. Defendant N.D. (Natalie),[2] the biological mother of E.D. (Edgar), appeals from the April 5, 2012 order of the Family Part finding that she abused or neglected her child pursuant to N.J.S.A. 9:6-8.21(c)(4). For the reasons that follow, we are compelled to reverse and remand.

---

[2] To protect the privacy of the minor child and for ease of reference, we use fictitious names for the parties.

On October 19, 2011, the Division received a referral from Christ Hospital in Jersey City that the mother of a child delivered at thirty-six weeks gestation tested positive for cocaine after delivery.

Division caseworker Sandra Attal was dispatched to the hospital and interviewed Natalie that day. Natalie told Attal that she went to a friend's house a few days earlier and sniffed two lines of cocaine. When Attal asked Natalie who the father of the child was, she was unsure but identified two men as possibilities. Upon further questioning, it became apparent to Attal that Natalie lacked stable housing, although she planned to stay with friends of her mother until she could find an apartment. Natalie had no clothing, provisions, furniture, or supplies for the child but suggested that relatives might provide a crib. Natalie also made a vague reference that someone would be coming from Virginia with "things" for the child. Later that day, a hospital nurse informed Attal that Edgar's urine screen was positive for cocaine.

Concerned with Natalie's unaddressed drug use, lack of appropriate housing, and inability to provide for a newborn, the Division sought custody of Edgar. After filing an order to show cause, the Division was granted temporary custody of Edgar.

Natalie was offered psychological and substance abuse evaluations and supervised visitation.

Natalie failed to appear at the return on the order to show cause or at a subsequent fact-finding hearing, although she was represented by counsel throughout the proceedings.

At the fact-finding hearing, the Division called Attal who testified that Edgar was removed "[d]ue to [Natalie's] admitted cocaine use two days prior to delivery[,] . . . the fact that [Natalie] did not have stable housing at that point, and the child testing positive, which indicated that the child was at risk." In addition to her use of cocaine prior to Edgar's birth, Natalie admitted that she used cocaine around her birthday on January 23, 2011. Natalie also told Attal that "she was using marijuana and alcohol" during the first six months of her pregnancy, but stopped once she found out she was pregnant. Natalie explained to Attal that she used cocaine because she felt "overwhelmed." The Division also introduced into evidence medical records of Edgar and Natalie and various Division reports.

At the conclusion of the hearing, the court determined that the Division established, by a preponderance of the evidence, that Natalie "abused or neglected" Edgar pursuant to N.J.S.A. 9:6-8.21(c)(4). The court reasoned:

[I]n the case before this [c]ourt, . . . the use of the controlled illegal substance was two days before the baby was born. It was clearly after [Natalie] knew she was pregnant, and again, knew marijuana, alcohol would harm the baby. And one has to assume she knew there was a chance cocaine would harm the baby.

I think . . . every case is fact sensitive. Here, we're not talking about months before. We're talking about two days before. And I don't have any medical testimony before me. As I said, I can't prove the baby being born premature, or being a low weight was . . . directly caused by [Natalie] using cocaine. But certainly [Natalie] put this child at risk of harm by using a controlled dangerous substance intentionally knowing it could be harmful two days before the baby was born.

She also did not have appropriate housing for the child. And although the child tested positive for cocaine, there were no symptoms shown at that time, fortunately, very fortunately for the child.

And nobody's looking to punish [Natalie], but taking all of the facts that this [c]ourt has found together, [Edgar] was put at risk of serious physical harm by the mother's intentional ingestion of cocaine, or sniffing cocaine. Presumably not much more than a month before than the projected birth date, but as it happened, two days before the birth date.

. . . .

So, after reviewing the cases, I believe that based on these facts, and looking at the law which requires not just a child for purposes of finding abuse and neglect, to be physically harmed, but for there to be a substantial risk of harm. And

5

> I defy anyone to encourage anybody in their family while they're pregnant to use cocaine, knowing they're pregnant, because they think there's no substantial risk of harm to the child, particularly at that stage of pregnancy.
>
> So, I do find that [the Division] has proven its case by a preponderance of the evidence . . . .

On November 26, 2012, the Division filed a complaint seeking guardianship of Edgar and to terminate Natalie's parental rights. The court dismissed the Title Nine litigation on the same date. On June 4, 2013, Natalie's parental rights to Edgar were terminated following a trial and the Division was granted guardianship of the child. Natalie did not appear during that proceeding and was not represented by counsel.

As a result of the Division's substantiation that Natalie abused or neglected Edgar, her name was placed in the Central Registry of child abusers in December 2011. See N.J.S.A. 9:6-8.11. On January 10, 2013, Natalie filed a notice of appeal of the trial court's finding that she abused or neglected Edgar. On appeal, Natalie raises the following point:

> THE TRIAL COURT'S DECISION THAT [NATALIE] ABUSED AND NEGLECTED [EDGAR], BASED SOLELY ON [EDGAR'S] POSITIVE COCAINE TEST AT BIRTH, WITHOUT ANY SHOWING THAT [EDGAR] WAS HARMED OR PLACED AT SUBSTANTIAL RISK OF HARM BECAUSE OF [NATALIE'S] USE OF COCAINE DURING PREGNANCY, MUST BE REVERSED IN LIGHT OF THE DECISION OF THE NEW JERSEY SUPREME COURT IN

A-2093-12T2

II.

At the outset, we note that the Family Part decided this matter prior to <u>New Jersey Department of Children & Families v. A.L.</u>, in which the Court discussed the proofs necessary to sustain a finding of abuse and neglect against a mother whose prepartum use of drugs resulted in a newborn testing positive for those drugs. <u>Id.</u> at 8-9. The Court rejected the Division's argument that the presence of cocaine metabolites in the newborn's meconium, standing alone, established proof of imminent danger or substantial risk of harm. <u>Id.</u> at 27-28. The Division makes a similar argument here, which the precedent established in <u>A.L.</u> compels us to reject.

The Family Part noted that Edgar tested positive for cocaine at birth but there was no evidence that he was suffering from withdrawal. The court also noted that Edgar had a low birth weight, which required placement in an incubator. Significant for present purposes, the court noted that the Division presented no medical testimony linking either Edgar's prematurity or low birth weight to Natalie's use of cocaine.

---

[3] <u>N.J. Dep't of Children & Families v. A.L.</u>, 213 <u>N.J.</u> 1 (2013).

Nevertheless, the court determined that Natalie put Edgar at risk by her use of cocaine. The judge was adamant, defying anyone to suggest that drug use at that stage of pregnancy would not be harmful to the child.

The judge's conclusion that a newborn testing positive for drugs suffers per se harm is well supported by numerous medical studies, and is the law in several states. See, e.g., Jane E. Ellis et al., In Utero Exposure to Cocaine: A Review, 86 S. Med. J. 725, 725-31 (1993); Charles R. Bauer et al., Acute Neonatal Effects of Cocaine Exposure During Pregnancy, 159 Archives Pediatrics & Adolescent Med. 824, 827 (2005); Rina D. Eiden et al., Effects of Prenatal Cocaine Exposure on Infant Reactivity and Regulation, 31 Neurotoxicol Teratol 60, 60-68 (2009); Lynn T. Singer et al., Cognitive and Motor Outcomes of Cocaine-Exposed Infants, 287 JAMA 1952, 1957 (2002).

Several states have enacted statutes that treat prenatal exposure to illegal substances as per se child abuse. See, e.g., Ark. Code Ann. § 12-18-103(14)(B)(i) (2013); Colo. Rev. Stat. § 19-1-103(1)(a)(VII) (2013); 325 Ill. Comp. Stat. Ann. 5/3 (Lexis Nexis 2014); Minn. Stat. § 626.556, subd. 2(f)(6) (2014); S.C. Code Ann. § 63-7-1660(F)(1)(a) (2013). Although similar per se legislation has recently been introduced in New

Jersey, see N.J. Assembly Bill No. 1137 (2014), our Legislature has not acted on it.

In the absence of such legislation, the Division must hew to the formula established in A.L. in cases where it seeks a finding of abuse or neglect against a mother for exposing a newborn to drugs in utero. In A.L., the Court determined that "[p]roof that a child's mother frequently used cocaine or other dangerous substances during pregnancy would be relevant to [the] issue" of abuse and neglect. A.L., supra, 213 N.J. at 23. However, the Court found that "not every instance of drug use by a parent during pregnancy, standing alone, will substantiate a finding of abuse and neglect in light of the specific language of the statute." Ibid. Thus, "[t]he proper focus is on the risk of substantial, imminent harm to the child, not on the past use of drugs alone." Ibid. In reversing the trial court's determination that A.L. abused or neglected her child, the Court reasoned that

> [o]n its own, the one entry [of a child's positive drug test] does not tell us whether the mother is an addict or used an illegal substance on a single occasion. The notation does not reveal the severity or extent of the mother's substance abuse or, most important in light of the statute, the degree of future harm posed to the child.
>
> [Id. at 27.]

Here, the judge's conclusion does not withstand scrutiny under the standard established in A.L., where the Court found that "[j]udges at the trial and appellate level cannot fill in missing information on their own or take judicial notice of harm." Id. at 28.

Natalie argues and the Division concedes that Edgar did not display signs of withdrawal after birth. Although accurate, this fact does little to illuminate the issue of whether Edgar was harmed.

First, signs of withdrawal are only one indicator of harm. See id. at 22 ("The Division can show that a newborn has been impaired in a number of ways."). The A.L. Court provided a partial list including, "evidence of respiratory distress, cardiovascular or central nervous system complications, low gestational age at birth, low birth weight, poor feeding patterns, weight loss through an extended hospital stay, lethargy, convulsions, or tremors." Id. at 23.

More importantly, unlike in utero exposure to opiates and methadone, which may cause severe withdrawal symptoms, see, e.g., N.J. Div. of Youth & Family Servs. v. Y.N., 431 N.J. Super. 74, 80-81 (App. Div.), certif. granted, 216 N.J. 13 (2013), newborns exposed to cocaine in utero frequently do not display any withdrawal symptoms. See American Academy of

Pediatrics, Committee on Drugs, <u>Neonatal Drug Withdrawal</u>, 101

<u>Pediatrics</u> 1079, 1079 (1998) ("Stimulant-exposed neonates

(amphetamines, cocaine, or both) have been shown to be less

symptomatic than opiate-exposed infants[.]"); Mark L. Hudak &

Rosemarie C. Tan, The Committee on Drugs and The Committee on

Fetus and Newborn, <u>Neonatal Drug Withdrawal</u>, 129 <u>Pediatrics</u>

e540, e542 (2012) ("Several studies that used masked evaluators

found that cocaine-exposed infants had either no or minimal

withdrawal signs compared with cocaine-naïve infants[.]").

The absence of withdrawal symptoms should not be viewed as

an indication that no harm has been done, as the effects of

cocaine exposure frequently do not manifest until years later

when a child's cognitive functions begin to develop.  See

Veronica H. Accornero et al., <u>Impact of Prenatal Cocaine</u>

<u>Exposure on Attention and Response Inhibition as Assessed by</u>

<u>Continuous Performance Tests</u>, 28 <u>J. Developmental & Behav.</u>

<u>Pediatrics</u> 195, 195—205 (2007) ("Results indicate cocaine-

associated increases in omission errors at ages 5 and 7 as well

as increases in response times for target tasks (i.e., slower

reaction times) and decreased consistency in performance at age

7."); John P. Ackerman et al., <u>A Review of the Effects of</u>

<u>Prenatal Cocaine Exposure Among School-Aged Children</u>, 125

<u>Pediatrics</u> 554, 563 (2010) (For school-aged children six years

and older, "performance on tasks that assess sustained attention and behavioral self-regulation seem to be compromised by [prenatal cocaine exposure]."); Henrietta S. Bada et al., Impact of Prenatal Cocaine Exposure on Child Behavior Problems Through School Age, 119 Pediatrics e348, e348 (2007) ("High prenatal cocaine exposure was associated with the trajectory of internalizing, externalizing, and total behavior problems [for children ages three to seven]."); Barbara L. Thompson et al., Prenatal Exposure To Drugs: Effects on Brain Development and Implications for Policy and Education, 10 Nature Reviews Neuroscience 303, 303—12 (2009) ("The recreational use of cocaine during pregnancy results in a subtle, though dominant developmental phenotype that resembles attention deficit disorder (ADHD). Detailed studies have demonstrated that prenatal cocaine exposure can have long-lasting negative effects on cognitive and attention systems, mediated via regions such as the prefrontal cortex, and other higher-order cortical areas that express dopamine receptors and receive rich dopaminergic projections from the midbrain. Recent data also suggest that there is increased likelihood that children exposed to cocaine prenatally will require special needs programs[.]").

The A.L. Court noted that in instances like these, where "the evidence presented does not demonstrate actual or imminent

harm, expert testimony may be helpful."  A.L., supra, 213 N.J. at 28.

In her brief, Natalie correctly notes that

> There were no medical experts or hospital personnel to interpret the positive urine test, the level of cocaine in [Edgar's] system, the effect such cocaine had or would have on him, and whether such cocaine would cause [Edgar] any harm in the future.

This is precisely the type of case that would have benefitted from expert testimony.

In this regard, we note that Edgar's premature delivery and low birth weight might be interpreted by a qualified expert as being related to Natalie's ingestion of cocaine.  Natalie does not dispute the Division's assertion that Edgar was born prematurely, with low birth weight placing him in the tenth percentile and body length placing him below the third percentile.  The judge specifically noted the absence of proof linking Edgar's premature delivery and low birth weight to Natalie's use of cocaine.

In addition, Edgar suffered a dramatic weight loss a few days after birth and had difficulty maintaining his body temperature.  Low birth weight and premature delivery have been associated with in utero cocaine exposure.  See Arden Handler et al., Cocaine Use During Pregnancy:  Prenatal Outcomes, 133 Am J. Epidemiology 818, 818-25 (1991) (discussing elevated risks of

low birth weight and prematurity in children of women who used cocaine during pregnancy compared to women who did not); Bauer, supra, at 824 ("Cocaine-exposed infants were about 1.2 weeks younger, weighed 536 g less, measured 2.6 cm shorter, and had head circumference 1.5 cm smaller than nonexposed infants[.]"); Singer, supra, at 1956 ("Cocaine-exposed infants had a lower gestational age, birth weight, head circumference, and length than unexposed infants. In the exposed group, there were more infants who were preterm, had a low birth weight, and were small for gestational age.").

Although expert testimony is not required in every abuse and neglect action, A.L., supra, 213 N.J. at 29, on the record before us, there can be no causal connection between Natalie's cocaine use and short- or long-term effects on Edgar's health without such testimony. The trial court was not free to make a finding of abuse or neglect on the basis of its own unsupported opinion or by taking notice of "the great weight of medical evidence" supporting its conclusion. See id. at 23, 29.

We realize that the Family Part heard this case before A.L. was decided and did not have the benefit of the Court's guidance on these critical matters. For that reason, we have decided to remand this matter with direction to reopen the hearing. All parties will be permitted to present additional evidence,

including medical and/or expert testimony, as to whether Edgar suffered long- or short-term harm as the result of his exposure to cocaine ingested by Natalie prior to his birth.

Reversed and remanded.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2093-12T2