# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2972-22

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

L.E.F.,

     Defendant-Appellant,

and

J.J.N.,

     Defendant,

_____

IN THE MATTER OF
J.J.N., a minor.

_____

Submitted December 19, 2024 – Decided June 23, 2025

Before Judges Natali and Vinci.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Monmouth County, Docket No. FN-13-0109-21.

Jennifer N. Sellitti, Public Defender, attorney for appellant (Beth Anne Hahn, Designated Counsel, on the briefs).

Matthew J. Platkin, Attorney General, attorney for respondent (Janet Greenberg Cohen, Assistant Attorney General, of counsel; Nicholas Dolinsky, Deputy Attorney General, on the brief).

Jennifer N. Sellitti, Public Defender, Law Guardian, attorney for minor J.J.N. (Noel C. Devlin, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

Defendant L.E.F. (Lisa)[1] appeals from a September 16, 2021 order wherein the Family Part judge found she abused and neglected her son, J.J.N. (John), by a preponderance of the evidence as a result of her prenatal drug use. For the reasons that follow, we vacate the order and remand for further proceedings.

I.

The day after John was born in March 2021, the Division of Child Protection and Permanency (Division) received a referral from Jersey Shore

---

[1] We identify the parties by initials and pseudonyms to protect confidential information in the record. R. 1:38-3(d)(12).

Medical Center (JSMC), reporting that he had tested positive for methadone, opiates, and benzodiazepines. Shortly thereafter, Gregory Jean, a Division intake worker, commenced an investigation and learned Lisa's urine tested positive for opiates and benzodiazepines, and John's meconium tested positive for opiates and methadone, and his urine positive for benzodiazepines. The Division subsequently filed a complaint for care, custody, and supervision of John.

According to the medical records admitted at the one-day fact-finding trial, John was placed in the Neonatal Intensive Care Unit (NICU), and after experiencing withdrawal symptoms, diagnosed with neonatal abstinence syndrome (NAS). The records also state John was exposed to Xanax, a benzodiazepine, methadone, and heroin in utero. John received "high Finnegan[2] scores," was placed in the NICU, and given methadone. Specifically, because John was "having increased withdrawal symptoms with elevated Finnegan scoring," and his meconium and urine tested positive for methadone, opiates, and benzodiazepines, the hospital's medical professionals

---

2  The Finnegan neonatal abstinence scale is a recognized tool for assessing whether a newborn is suffering from NAS, commonly known as withdrawal.

deemed it necessary to admit him to the NICU. The hospital also administered phenobarbital to John due to concerns of polysubstance abuse while in utero.

Jean observed John in the NICU and noted he was "going through withdrawals," as he was "trembling, shaking, crying," and having difficulty eating. The hospital records further reveal between March and April 2021, John experienced mild-to-moderate tremors, poor feeding, excessive sucking, increased muscle tone, and high-pitched crying. In April, John was transferred to Children's Specialized Hospital and stopped receiving methadone in May 2021, fifty days after his birth. John's discharge summary states he was diagnosed with (1) NAS, (2) abnormal newborn screen, (3) prenatal exposure to benzodiazepines and opiates, and (4) prenatal exposure to hepatitis C.

Jean interviewed Lisa who acknowledged her long history of substance abuse. Lisa stated she "transitioned from marijuana to pain killers, Xanax and [Klonopin,] and then began using [h]eroin." She also told Jean she had prescriptions for methadone, Zoloft, Zofran, and Alprazolam.[3] She also reported she had not been using illicit drugs since 2019, relapsed on cocaine prior to finding out she was pregnant at twenty-three weeks, and remained

---

[3] Alprazolam, a benzodiazepine, is the active ingredient in Xanax. See State v. Michaels, 219 N.J. 1, 9 (2014) ("[A]lprazolam (a type of benzodiazepine that is the active ingredient in Xanax).").

A-2972-22

"clean" during the remainder of her pregnancy. Jean further reported Lisa disclosed she was prescribed Tylenol with codeine for pain during contractions, but the Division never requested Lisa sign a release for the alleged Tylenol prescription.

Records from Ocean Monmouth Care, Lisa's methadone treatment program, reveal from September 8, 2020, to March 10, 2021, she completed twenty-one urine drug screenings on seven individual days. Lisa tested positive for methadone all twenty-one times, as well as positive for cocaine six times, benzodiazepines twelve times, opiates eighteen times, and fentanyl three times. The last drug screenings prior to John's birth, dated March 10, 2021, reveal Lisa tested positive only for methadone. The medical records also reveal Lisa tested positive for methadone, opiates, benzodiazepines, and cocaine thirty-three days after John's birth. Based on Lisa's multiple positive drug screenings for both illicit and prescribed substances, as well as John testing positive for opiates, methadone, and benzodiazepines at birth, and his withdrawal symptoms, the Division substantiated Lisa for abuse or neglect.

At the fact-finding proceeding, the Division did not call any of Lisa's treating physicians or proffer expert testimony. Instead, it introduced the

5

aforementioned medical records and called only Jean and Jillian Kolupanowich, a Division permanency worker. Lisa testified on her own behalf.

Jean testified consistent with his screening summary that he spoke with staff at the hospital where John was born who informed him Lisa left the hospital against medical advice. When Lisa's counsel objected that Jean's response with respect to this discussion with hospital staff constituted inadmissible hearsay, the court overruled the objection and noted it would allow the testimony, ostensibly for its non-hearsay purposes as it provided the court with "an understanding of what actions . . . Jean took in response to his visit to the hospital when [Lisa] wasn't there."

Kolupanowich testified when she was assigned to Lisa's case, she requested and received certified records from JSMC, Children's Specialized Hospital, and Ocean Monmouth Cares, and the Division sought to introduce those records into evidence in their entirety. Lisa's counsel lodged a limited objection, noting he objected to the extent the records contained embedded hearsay as to "diagnoses" and "medical opinions." The court admitted the records along with the Division's reports specifically "with the understanding that any complex diagnoses will not be considered."

A-2972-22

Lisa testified before she found out she was pregnant she used "[h]eroin, [and] sometimes cocaine." She further testified, however, she did not use illegal drugs after finding out she was pregnant at twenty-two weeks, and that she "just stayed on [the] medication that [she] was prescribed." Lisa also stated she was unaware of the positive drug screenings from November 2020 through February 2021 and believed they were inaccurate. She testified she was prescribed the Tylenol with codeine by a dentist when she had teeth pulled and took it before she went to the hospital "right when [she] was in labor," and noted the Division failed to obtain a release for that medication. Lisa stated she did not know when her dentist prescribed the medication.

At the close of evidence, the court issued an oral decision finding the Division proved by a preponderance of the evidence Lisa abused or neglected John pursuant to N.J.S.A. 9:6-8.21 and commented that it did not "really understand what [was] in dispute." The court found both Jean and Kolupanowich "highly credible witnesses" who "investigated and reported on the case in good faith."

The court also found on admission to JSMC, Lisa tested positive for opiates and benzodiazepines, and at birth, John's meconium was positive for

opiates and benzodiazepines. It also acknowledged Lisa had prescriptions for methadone and benzodiazepines.

The court explained it "fully appreciate[d] that medically-assisted treatment used to assist those who suffer from addiction to opiates, such as methadone and suboxone[,] is vitally important, but that is not what we have here." Rather, the court found Lisa "acknowledged . . . her drug of choice is heroin," and "she had relapsed on cocaine when she learned that she was pregnant in November of 2020." The court recounted Lisa's drug screening results from November 2020 through March 2021, found her explanation regarding why she took Tylenol with codeine to be incredible, and found Lisa was not prescribed Tylenol with codeine for contraction pain.

The court explained, "[t]he bottom line is that [Lisa] ingested . . . unprescribed opiates prior to the birth of baby [John], again which were not prescribed for contraction pain." Notably, the court also stated, "[t]he degree to which the opiates may have additionally contributed to the harm actually caused to [John] is superfluous," and "the degree of harm caused to [John] by the additional ingestion of opiates would require expert testimony, but clearly, harm was caused to . . . [John]."

With respect to the harm John experienced, the court found:

As we know, he was hospitalized for [fifty] days and . . . Jean, testified that he himself observed [John] to be shaking and trembling and crying. Methadone had to be given to [John] in increasing doses, which were administered clearly to address his withdrawal symptoms.

[John] was transferred from the NICU at [JSMC] to Children's Specialized Hospital[,] where he remained until May 17[], 2021. Again, the severity of the harm[,] as distressing as it is to think about[,] is not relevant. Harm did occur and the mother caused that harm by ingesting opiates, in addition to her prescribed substances of methadone and perhaps benzodiazepines.

The court distinguished New Jersey Department of Children & Families v. A.L., 213 N.J. 1 (2013), and stated, in that case, "there was no showing of actual harm to the baby." It noted in A.L., however, "the Court did find that the Division can show actual harm to a newborn in a number of ways, including proof that a child is suffering from withdrawal symptoms at birth[,] and that is clearly what we have here."

After a series of compliance hearings, the court terminated the protective services litigation and granted kinship legal guardianship of John to Lisa's mother. This appeal followed.

II.

Lisa argues the court erred in accepting the Division's argument NAS was not a complex diagnosis requiring expert testimony and in concluding the

9

Division's two witnesses competently testified regarding the medical records to support a Title Nine judgment. Lisa further argues the court contradicted its ruling that it would not consider any complex diagnoses in the medical records from JSMC and Children's Specialized Hospital and further that it considered Jean's testimony that John's "shaking and trembling and crying" were symptoms of withdrawal.

Relying on New Jersey Division of Youth & Family Services v. M.G., 427 N.J. Super. 154 (App. Div. 2012), and Clowes v. Terminix International, Inc., 109 N.J. 575 (1988), Lisa contends NAS, like alcoholism and post-traumatic stress disorder (PTSD), are complex diagnoses requiring evidence beyond hearsay medical records. Lisa also relies on New Jersey Division of Child Protection & Permanency v. N.T., 445 N.J. Super. 478 (App. Div. 2016), and New Jersey Division of Child Protection & Permanency v. N.B., 452 N.J. Super. 513 (App. Div. 2017), for the proposition that a diagnosis of NAS requires expert testimony.

Lisa also cites New Jersey Division of Child Protection & Permanency v. A.D., 455 N.J. Super. 144, 158-59 (App. Div. 2018), in support of her argument "'medical opinions in hospital records' [are] inadmissible in cases where the defendant would be 'deprived of an opportunity to cross-examine the declarant

on a critical issue[,] such as the basis for the diagnosis or cause of the condition in question.'" She also contends the observations underlying the Finnegan system, which she describes as a "scoring system" developed for assessing the severity of NAS, could be exaggerated when a baby is experiencing other conditions. "The subjectivity and potential for bias when scoring is evidenced by the fact that while at JSMC, more than eighty hospital personnel assessed John's symptoms, mainly registered nurses, whom the State never presented as witnesses, expert or otherwise."

We begin with the applicable standard of review. Appellate review of the Family Part's factual findings is "strictly limited." N.J. Div. of Youth & Fam. Servs. v. I.H.C., 415 N.J. Super. 551, 577 (App. Div. 2010). We accept the court's factual findings as long as they are supported by "'adequate, substantial, and credible evidence' in the record." A.D., 455 N.J. Super. at 155 (quoting N.B., 452 N.J. Super. at 521). Intervention is appropriate only "if the trial court's conclusions are 'clearly mistaken or wide of the mark.'" N.J. Div. of Youth & Fam. Servs. v. L.L., 201 N.J. 210, 227 (2010) (quoting N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008)).

The deference afforded the family court is based on "its superior position to judge the credibility of witnesses and weigh the evidence." N.J. Div. of Child

Prot. & Permanency v. J.R.-R., 248 N.J. 353, 368 (2021). Family Part judges possess "specialized knowledge and experience in matters involving parental relationships and the best interests of children." N.J. Div. of Child Prot. & Permanency v. S.K., 456 N.J. Super. 245, 261 (App. Div. 2018) (citations omitted).

No deference is afforded, however, to the court's legal conclusions drawn from its factual findings. N.J. Div. of Child Prot. & Permanency v. B.H., 460 N.J. Super. 212, 218 (App. Div. 2019) (citing N.J. Div. of Child Prot. & Permanency v. K.G., 445 N.J. Super. 324, 342 (App. Div 2016)). Additionally, we review evidentiary rulings under an abuse of discretion standard. State v. Nantambu, 221 N.J. 390, 402 (2015) (citing State v. Harris, 209 N.J. 431, 439 (2012)).

We are satisfied Lisa has not established the medical opinion that John suffered from NAS was so complex or so likely to be inaccurate as to require exclusion under the applicable Rules of Evidence, and specifically N.J.R.E. 808. See M.G., 427 N.J. Super. at 174 (distinguishing opinions based on "the exercise of subjective judgment rather than a straightforward, simple diagnosis based upon objective criteria or one upon which reasonable professionals could not differ"). "[C]ase law in our State has traditionally admitted 'routine' findings of

experts contained in medical records that satisfy the business record exception . . . ." James v. Ruiz, 440 N.J. Super. 45, 63 (App. Div. 2015) (quoting State v. Matulewicz, 101 N.J. 27, 32 n.1 (1985)).

N.J.R.E. 803(c)(6) provides that "opinions or diagnoses" within business records are admissible "subject to [N.J.R.E.] 808." N.J.R.E. 808 provides:

> Expert opinion that is included in an admissible hearsay statement shall be excluded if the declarant has not been produced as a witness unless the court finds that the circumstances involved in rendering the opinion tend to establish its trustworthiness. Factors to consider include the motive, duty, and interest of the declarant, whether litigation was contemplated by the declarant, the complexity of the subject matter, and the likelihood of accuracy of the opinion.

In A.L., our Supreme Court ruled that evidence that a child is suffering from withdrawal symptoms at birth "may come from any number of competent sources including[:] medical and hospital records, health care providers, caregivers, or qualified experts." 213 N.J. at 23. The Court did "not require expert testimony in abuse and neglect actions," because "an adequate presentation of actual harm or imminent danger can be made without the use of experts." Id. at 29. Here, the certified hospital records could be admitted without expert testimony as to the issue of John's NAS diagnosis.

A-2972-22

The court's finding John suffered harm was based on his diagnosis of NAS and him being administered methadone following birth. A diagnosis of NAS was based on objective observations, rather than subjective ones, and defendant does not cite binding authority in which NAS was determined to be a complex diagnosis requiring expert testimony. Defendant's reliance on M.G., 427 N.J. Super. at 154; Clowes, 109 N.J. at 597-98; N.T., 445 N.J. Super. at 501; and N.B., 452 N.J. Super. at 523-26, are misplaced because those cases involved the complex diagnoses of PTSD and alcoholism, which involved subjective evaluations. NAS, however, does not require such subjective evaluations, but rather is diagnosed through objective observations of a newborn.

III.

Lisa argues the court's finding her testimony incredible with respect to her taking Tylenol with codeine was "inconsistent with [the] current understanding of addiction." She relies on New Jersey Division of Child Protection & Permanency v. Y.N., 220 N.J. 165 (2014), and asserts in that case, the mother followed medical advice and entered into a methadone treatment program after being addicted to a prescribed opiate.

Lisa contends Title Nine "does not require a finding of abuse or neglect when an addicted woman, who learns that she is pregnant, seeks timely

14

professional treatment for her addiction that will improve the outcome for her unborn child." Id. at 185. She notes in addition to being prescribed methadone at the time of John's birth, she was also prescribed Zofran, Zoloft, and Xanax. Lisa also reasserts her claim Jean did not ask her to produce proof of her Tylenol with codeine prescription.

Lisa next contends the court erred in concluding the record "unambiguously established abuse or neglect through harm to John that was attributable to withdrawal from an illicit, unprescribed substance." Specifically, Lisa argues NAS could be caused by methadone or another of Lisa's prescribed medications. With respect to her drug screenings, Lisa maintains those screenings lacked specificity and "without reported concentrations of these or any substance tested, the screening results failed to elucidate for the trial judge if, or which of, these substances resulted in John's alleged symptoms."

"Title [Nine] controls the adjudication of abuse and neglect cases." N.J. Div. of Youth & Family Servs. v. M.C. III, 201 N.J. 328, 343 (2010) (citing N.J.S.A. 9:6-8.21 to -8.73). "The focus of Title [Nine] 'is not the culpability of parental conduct" but rather "the protection of children.'" N.J. Div. of Child Prot. & Permanency v. A.B., 231 N.J. 354, 368 (2017) (quoting Div. of Child Prot. & Permanency v. E.D.-O., 223 N.J. 166, 178 (2015)).

A-2972-22

The Division "must prove that the child is 'abused or neglected' by a preponderance of the evidence, and only through the admission of 'competent, material[,] and relevant evidence.'" N.J. Div. of Youth & Fam. Servs. v. P.W.R., 205 N.J. 17, 32 (2011) (quoting N.J.S.A. 9:6-8.46(b)). Each case of alleged abuse is "generally fact sensitive." Id. at 33. The proofs must be evaluated based on the totality of the circumstances. Id. at 39.

Title Nine defines an "abused or neglected child" as one under the age of eighteen whose

> physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of [their] parent or guardian . . . to exercise a minimum degree of care (a) in supplying the child with adequate food, clothing, shelter, education, medical[,] or surgical care though financially able to do so or though offered financial or other reasonable means to do so, or (b) in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, including the infliction of excessive corporal punishment.
>
> [N.J.S.A. 9:6-8.21(c)(4).]

The "minimum degree of care" element in subsection (c)(4) reflects "the intermediary position between simple negligence and the intentional infliction of harm." A.B., 231 N.J. at 369 (citing G.S. v. Dep't. of Hum. Servs., Div. of Youth & Fam. Servs., 157 N.J. 161, 179 (1999)). Upon considering the totality

16

of the circumstances and assessing each case on its facts, the court must determine whether the parent or guardian "fail[ed] to exercise a minimum degree of care when [they are] aware of the dangers inherent in a situation and fail[ to] adequately . . . supervise the child or recklessly creates a risk of serious injury to that child." Ibid. (quoting G.S., 157 N.J. at 181).

The failure to exercise a "minimum degree of care" refers to "conduct that is grossly or wantonly negligent, but not necessarily intentional. Conduct is considered willful or wanton if done with the knowledge that injury is likely to, or probably will, result." G.S., 157 N.J. at 178 (citations omitted). A parent fails to exercise a minimum degree of care if, despite being "aware of the dangers inherent in a situation," the parent "fails adequately to supervise the child or recklessly creates a risk of serious injury to that child." Id. at 181.

Under the statute, abuse or neglect can be based on either (1) actual harm or (2) substantial risk of harm. "If there is no evidence of actual harm, . . . the statute requires a showing of 'imminent danger' or a 'substantial risk' of harm before a parent or guardian can be found to have abused or neglected a child." A.L., 213 N.J. at 8 (emphasis omitted) (quoting N.J.S.A. 9:6-8.21(c)).

A "fact-finding hearing is a critical element of the abuse and neglect process," N.J. Div. of Child Prot. & Permanency v. S.G., 448 N.J. Super. 135,

143 (App. Div. 2016) (citation omitted), where the Division may submit only "competent, material[,] and relevant evidence." Ibid. (quoting P.W.R., 205 N.J. at 32). N.J.S.A. 9:6-8.46(a)(3) provides, in relevant part, that in a Title Nine hearing,

> any writing, record[,] or photograph, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any condition, act, transaction, occurrence or event relating to a child in an abuse or neglect proceeding of any hospital or any other public or private institution or agency shall be admissible in evidence in proof of that condition, act, transaction, occurrence[,] or event, if the judge finds that it was made in the regular course of the business of any hospital or any other public or private institution or agency, and that it was in the regular course of such business to make it, at the time of the condition, act, transaction, occurrence[,] or event, or within a reasonable time thereafter, shall be prima facie evidence of the facts contained in such certification.

A writing or record satisfies the regular-course-of-business requirement of N.J.R.E. 808 if it satisfies the business-records exception, N.J.R.E. 803(c)(6), to the hearsay rule, N.J.R.E. 802. N.T., 445 N.J. Super. at 494. Diagnoses and opinions of a medical-services provider in a record or report constitute inadmissible hearsay, id. at 500, unless they are included in business records under N.J.R.E. 806(c)(6) and satisfy the requirements of N.J.R.E. 808.

A-2972-22

We have held that "when the expert is not produced as a witness, [N.J.R.E. 808] requires the exclusion of [their] expert opinion, even if contained in a business record, unless the trial judge makes specific findings regarding trustworthiness." M.G., 427 N.J. Super. at 174 (citing Matulewicz, 101 N.J. at 30). Moreover, "[a]n expert medical opinion contained in a report is generally inadmissible under [N.J.R.E. 808's] test because of the complexity of the analysis involved in arriving at the opinion and the consequent need for the other party to have an opportunity to cross-examine the expert." N.T., 445 N.J. Super. at 501 (alterations in original) (quoting N.J. Div. of Youth & Fam. Servs. v. B.M., 413 N.J. Super. 118, 130 (App. Div. 2010)).

The protection of the abuse and neglect statute "is limited to the condition of a child after birth." A.L., 213 N.J. at 22 (citing N.J. Div. of Youth & Fam. Servs. v. L.V., 382 N.J. Super. 582, 590 (Ch. Div. 2005)). "If an expectant mother's drug use causes actual harm to the physical, mental, or emotional condition of a newborn child, a finding of abuse or neglect is appropriate." Id. at 8. Moreover, Title Nine asks "whether [the child], as a newborn, 'ha[s] been impaired' or was in 'imminent danger of becoming impaired' as a result of [their] mother's failure to exercise a minimum degree of care by unreasonably inflicting

19

harm or allowing a 'substantial risk' of harm to be inflicted." Id. at 22 (quoting N.J.S.A. 9:6-8.21(c)(4)(b)).

The Division can show that a newborn has been impaired in a number of ways. For example, proof that a child is suffering from withdrawal symptoms at birth could establish actual harm. See, e.g., In re Guardianship of K.H.O., 161 N.J. 337, 349 (1999) (noting in context of termination of parental rights action that "a child born addicted to drugs and suffering from the symptoms of drug withdrawal as a result of [their] mother's substance abuse during pregnancy has been harmed by [their] mother and that harm endangers the child's health and development").

> In addition, the Division can prove actual harm by showing evidence of respiratory distress, cardiovascular or central nervous system complications, low gestational age at birth, low birth weight, poor feeding patterns, weight loss through an extended hospital stay, lethargy, convulsions, or tremors. That information may come from any number of competent sources including medical and hospital records, health care providers, caregivers, or qualified experts.
>
> [A.L., 213 N.J. at 22-23 (citations omitted).]

Therefore, the primary question under Title Nine is whether John, "as a newborn, 'ha[s] been impaired' or was in 'imminent danger of becoming impaired' as a result of his mother's failure to exercise a minimum degree of care

20

by unreasonably inflicting harm or allowing a 'substantial risk' of harm to be inflicted." Id. at 22 (quoting N.J.S.A. 9:6-8.21(c)(4)(b)). Our case law is clear: "not every instance of drug use by a parent during pregnancy, standing alone, will substantiate a finding of abuse and neglect in light of the specific language of the statute." Id. at 23; see also N.J. Div. of Youth & Fam. Servs. v. N.D., 435 N.J. Super. 488, 494 (App. Div. 2014).

In two cases involving prenatal drug abuse, our Supreme Court reversed findings of abuse or neglect because there was inadequate proof of imminent or actual harm to the child, or of parental fault. In A.L., a newborn tested positive for cocaine after delivery as a result of his mother's prenatal cocaine use. 213 N.J. at 9-10. The Court noted that the newborn did not experience any complications, and that the record established only the presence of cocaine metabolites in the newborn's meconium. Id. at 27-28. As examples of actual impairments that would satisfy the statute, the Court suggested "proof that a child is suffering from withdrawal symptoms at birth could establish actual harm." Id. at 22 (citations omitted).

The A.L. Court held that the presence of cocaine in the infant's system, "without more, does not establish proof of imminent danger or substantial risk of harm." Id. at 27-28 (citing N.J.S.A. 9:6-8.21(c)(4)(b)). "Proof that a child's

21

mother frequently used cocaine or other dangerous substances during pregnancy would be relevant," however, "not every instance of drug use by a parent during pregnancy, standing alone, will substantiate a finding of abuse and neglect." Id. at 23.

While expert testimony is not uniformly required in abuse or neglect cases, it is required where presence of drugs in the child's meconium is unaccompanied by other evidence of actual harm or imminent danger. Id. at 29. Thus, in N.D., we held that expert testimony was required to establish a causal connection between a mother's cocaine use and effects on the child's health. 435 N.J. Super. at 497. We noted that prenatal cocaine use generally does not cause the same noticeable withdrawal symptoms as does opiate use. Id. at 495-96.

Even where there is ample proof the newborn suffered drug-induced complications, a finding of abuse or neglect also requires proof of parental fault. In Y.N., a mother's newborn suffered from NAS as the result of the mother's participation in a methadone program. 220 N.J. at 169-70. The mother was taking Percocet, a prescription opioid, after a physical injury. Id. at 169. After learning she was pregnant, she followed the advice of a medical professional and entered a methadone program, which posed a lesser risk to the child than abruptly discontinuing the use of Percocet. Ibid.

The Court held "absent exceptional circumstances, a finding of abuse or neglect cannot be sustained based solely on a newborn's enduring methadone withdrawal following a mother's timely participation in a bona fide treatment program prescribed by a licensed healthcare professional to whom she has made full disclosure." Id. at 185-86. It did not address whether a finding of abuse or neglect could be grounded on the parent's unjustified delay in seeking treatment, which might adversely affect the newborn's symptoms. Id. at 186.

In finding that there was insufficient evidence of abuse or neglect, the Court cautioned against "concentrating on harm without regard to parental fault." Id. at 183-84. The Court stressed that Family Part judges must assess "whether [the mother] exercised a 'minimum degree of care' or 'unreasonably' inflicted harm on her newborn. Whether a parent exercised a minimum degree of care must 'be analyzed in light of the dangers and risks associated with the situation.'" Id. at 184 (first quoting N.J.S.A. 9:6–8.21(c)(4)(b); and then quoting G.S., 157 N.J. at 181-82).

This case presented the court with the idiosyncratic facts of an expectant mother who, indisputably, participated in a methadone program and was prescribed other medications, but as the record confirms, also took illegal, unprescribed medications including opiates during her pregnancy. As to her

23

prescriptions for methadone, the Division does not contest defendant participated in a prescribed program, like the mother in Y.N., nor that her other prescriptions for Xanax, Zofran, and Zoloft were also provided by a licensed physician.

In light of the combination and exposure of prescribed and unprescribed medications and considering Y.N., N.D., and A.L. together, we are convinced further fact-finding is necessary to determine whether Lisa's illicit drug use caused, in whole or in part, John's NAS. Although the facts in this matter do not fall squarely within the confines of Y.N., the confluence of the aforementioned unique circumstances here makes it all the more necessary to establish, with appropriate findings, the causal link, if any, between Lisa's use of illicit substances and John's NAS diagnosis. In reaching our decision, we are cognizant of the Supreme Court's holding in A.L. that although a parent's use of drugs, without more, will not necessarily support of finding of abuse or neglect, a mother's use of illegal substances while she is pregnant is relevant to deciding whether there was abuse or neglect. 213 N.J. at 22.

Specifically, the court shall make findings under N.J.R.E. 808 to determine whether John's medical records may be admitted to establish if his withdrawal symptoms were caused by Lisa's methadone treatment or prescribed

24

medications, ingestion of illegal drugs, or a combination of both. If John's withdrawal symptoms were caused by Lisa's illegal drug use, individually or in combination with her prescribed medications, a finding she abused or neglected John would be entirely appropriate as John's withdrawal symptoms were sufficient to constitute harm. If, however, John's withdrawal symptoms were caused by Lisa's methadone treatment alone or her other prescribed medications, finding she abused or neglected John would be inconsistent with Y.N.

We cannot conclude, as did the court, that the fact defendant combined those medications was "superfluous" in the context of a Title Nine finding. The court based its decision that John suffered actual harm or was exposed to the risk of harm solely from the admitted medical records and the Division's summaries. But such cause-based diagnoses could only be deemed admissible if the court made the necessary findings under N.J.R.E. 808, which did not occur, and which we are unable to make on the current record, even if appropriate under a plain error analysis. Instead, under these unique facts, the court should have made appropriate findings under N.J.R.E. 808 as to the admissibility of John's medical records in which, as noted, his physicians alluded to the causal link of his in-utero exposure to illicit substances and his withdrawal symptoms.

John suffered from many of the conditions identified in A.L. as probative of actual harm. But the Division's case suffered from a similar lack of proof as to causation in N.D., where the newborn tested positive for cocaine and the mother admitted to using cocaine, alcohol, and marijuana during her pregnancy. 435 N.J. Super. at 490-91. Her son was born premature, with low birth weight, and was placed in an incubator. Id. at 493, 496-97. He tested positive for cocaine, and although not diagnosed with NAS, id. at 493, it was not disputed the infant experienced "dramatic weight loss . . . and had difficulty maintaining his body temperature" just days after his birth. Id. at 497.

In that case, the medical evidence did not link the mother's cocaine use to the child's premature birth or low birth weight. Id. at 493. As we stated, "[t]here were no medical experts or hospital personnel to interpret the positive urine test, the level of cocaine in [the child's] system, the effect such cocaine had or would have on [them], and whether such cocaine would cause [the child] any harm in the future." Id. at 496. Despite this dearth of critical causative proofs, the trial court found that the child suffered per se harm because he tested positive for cocaine, "defying anyone to suggest that drug use at that stage of pregnancy would not be harmful to the child." Id. at 493.

In reversing, we stated "the judge's conclusion does not withstand scrutiny under the standard established in A.L., where the [c]ourt found that '[j]udges at the trial and appellate level cannot fill in missing information on their own or take judicial notice of harm.'" Id. at 494 (alteration in original) (quoting 213 N.J. at 28). Although we acknowledged expert testimony was not required in every case, we found no causal connection could be established between the mother's cocaine use and the effects on her son's health without expert testimony on the record presented and stated, "[t]he trial court was not free to make a finding of abuse or neglect on the basis of its own unsupported opinion or by taking notice of 'the great weight of medical evidence' supporting its conclusion." Id. at 497 (quoting A.L., 213 N.J. at 23, 29).

Further, while we recognize the Division also contended before the court that Lisa's use of illegal substances in the months leading up to John's birth placed him at a substantial risk of harm, the court clearly based its abuse and neglect finding upon the fact that "[h]arm did occur and [Lisa] caused that harm by ingesting opiates, in addition to her prescribed substances of methadone and perhaps benzodiazepines." In fact, the Division's trial proofs were animated by the actual harm John sustained. It did not elicit any testimony with respect to how Lisa's use of illicit substances posed a substantial risk of harm to John.

Therefore, we vacate the court's September 16, 2021 order finding Lisa abused or neglected John. We remand for the court to make appropriate findings under N.J.R.E. 808 as to the admissibility of John's medical records with respect to the causal link between Lisa's illicit drug use and John's NAS diagnosis. And we leave it to the court's discretion whether to reopen the proceedings to address N.J.R.E. 808's requirements and whether the parties may proffer testimony from a medical professional establishing the causal link, if any, between Lisa's illicit drug use and John's NAS diagnosis.

Vacated and remanded for further proceedings in accordance with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division